**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| HF SINCLAIR REFINING & MARKETING LLC (f/k/a HOLLYFRONTIER REFINING & MARKETING LLC), | § § § § § | |
| *Plaintiff,* | § § | Case No. 3:23-cv-1798-X |
| v. | § § | Hon. Judge Brantley Starr |
| NEXTERA ENERGY MARKETING, LLC, | § § § | |
| *Defendant.* | § § | |

---

**NEXTERA ENERGY MARKETING, LLC'S BRIEF IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...........................................................................4

    A.    The Parties and Relevant Non-Parties .......................................................4

    B.    The Base Contract .....................................................................................5

    C.    The Force Majeure Provisions ...................................................................6

    D.    The Transaction Confirmation ..................................................................7

    E.    The Uri Weather Event ..............................................................................9

    F.    NEM's Efforts to Overcome the Force Majeure......................................13

    G.    HFS's Attempted Sellback on February 18, 2021 ...................................15

LEGAL STANDARD.............................................................................................................17

ARGUMENT ..........................................................................................................................18

I.     WINTER STORM URI WAS A FORCE MAJEURE EVENT. ......................................18

    A.    There Is No Dispute That Uri Was a Force Majeure Under Section 11.2................18

    B.    There Is No Dispute that Uri Caused the Delivery Failures.....................................19

    C.    There Is No Dispute that NEM Gave HFS Adequate Notice of Force Majeure................................................................................................................20

II.    HFS'S INCORRECT INTERPRETATION OF SECTION 11.8 DOES NOT RAISE A GENUINE ISSUE FOR TRIAL..............................................................................20

    A.    NEM's Force Majeure Was Not Subject to Section 11.8. ......................................20

    B.    There Is No Genuine Dispute as to the Availability of Replacement Gas............26

III.   HFS RAISES NO OTHER TRIABLE ISSUES AS TO FORCE MAJEURE. .................28

    A.    There Is No Genuine Dispute as to NEM's Efforts to Resume Performance........................................................................................................28

    B.    NEM's Allocation of Gas Was Fair and Reasonable.............................................28

IV.   HFS HAS NO CLAIM FOR NON-DELIVERY ON FEBRUARY 18, 2021...................29

CONCLUSION................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................................17

*Aperia Sols., Inc. v. eVance, Inc.*,
    2023 WL 3441516 (N.D. Tex. May 12, 2023), *reconsideration denied,* 2024
    WL 1257492 (N.D. Tex. Mar. 25, 2024) .........................................................18

*Ark. Okla. Gas Corp. v. BP Energy Co.*,
    2023 WL 3620746 (W.D. Ark. May 24, 2023) ...............................................19

*Atlas Air, Inc. v. Biskay Holdings LLC*,
    2018 WL 3155828 (N.D. Tex. June 28, 2018) ................................................30

*Atmos Energy Corp. v. Paul*,
    598 S.W.3d 431 (Tex. App.—Fort Worth Mar. 5, 2020) ................................23

*Berge Helene Ltd. v. GE Oil & Gas, Inc.*,
    896 F. Supp. 2d 582 (S.D. Tex. 2012) ...........................................................30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................17

*David Lewis Builders, Inc. v. Mid-Continent Cas. Co.*,
    720 F. Supp. 2d 781 (N.D. Tex. 2010), *aff'd*, 410 F. App'x 787 (5th Cir. 2011)...................30

*Edrich v. Dallas Coll.*,
    2023 WL 8606816 (N.D. Tex. Dec. 12, 2023) ...............................................17

*Endure Indus. Inc. v. Vizient Inc.*,
    No. 3:20-CV-3190-X, 2024 WL 4449736 (N.D. Tex. Oct. 9, 2024) ..............17

*Ergon-W. Virginia, Inc. v. Dynegy Mktg. & Trade*,
    706 F.3d 419 (5th Cir. 2013) ...................................................3, 23, 24, 25, 26, 28

*Exxon Co., U.S.A. v. Sofec, Inc.*,
    517 U.S. 830 (1996)........................................................................................30

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994)...........................................................................23

*iStick Cap. Mgmt., LLC v. Arena Ltd. SPV, LLC*,
    2021 WL 3427327 (N.D. Tex. Aug. 5, 2021)..................................................23

*Little v. First S. Prod. Credit Ass'n.*,
  22 F.3d 1094, 1994 WL 198937 (5th Cir. 1994) .................................................................18

*LNG Americas, Inc. v. Chevron Nat. Gas*,
  2023 WL 2920940 (S.D.Tex. 2023) ..............................................4, 14, 22, 23, 25, 28, 29

*Luminant Energy Co. LLC v. Pub. Util. Comm'n of Texas*,
  665 S.W.3d 166 (Tex. App.—Austin 2023, pet. filed)..............................................19

*Marathon Oil Co. v. Koch Energy Servs., LLC*,
  2023 WL 4032879 (S.D. Tex. May 8, 2023) ..................................................24, 26

*Marathon Oil Co. v. Koch Energy Servs., LLC*,
  2023 WL 5167036 (S.D. Tex. July 27, 2023)................................................24, 26

*Marshall v. El Paso Nat. Gas Co.*,
  874 F.2d 1373 (10th Cir. 1989) ....................................................................12

*Mieco LLC v. Pioneer Nat. Res. USA, Inc.*,
  2023 WL 2064723 (N.D. Tex. 2023)..............................................3, 19, 23, 24, 25

*Mieco L.L.C. v. Pioneer Nat. Res. USA, Inc.*,
  109 F.4th 710 (5th Cir. 2024) ....................................................................3, 23, 25

*NextEra Energy Mktg., LLC v. Macquarie Energy LLC*,
  Case No. 1:22-cv-01345 (S.D.N.Y. 2022)................................................................27

*Rice v. Cornerstone Hosp. of W. Monroe, L.L.C.*,
  674 Fed. Appx. 391 (5th Cir. 2017)................................................................17

*Serna, Inc. v. Harman*,
  742 F.2d 186 (5th Cir. 1984) ........................................................................30

*Targa Gas Mktg. LLC v. Mieco LLC*,
  2023 WL 9546743 (S.D. Tex. Aug. 8, 2023) ................................................19, 20, 23

*Tejas Power Corp. v. Amerada Hess Corp.*,
  1999 WL 605550 (Tex. App. Aug. 12, 1999)................................................14, 24, 29

*Unit Petroleum Co. v. Koch Energy Servs.*,
  LLC, 2023 WL 4828375 (S.D. Tex. July 27, 2023) ................................................19

*Water Dynamics, Ltd. v. HSBC Bank USA, Nat. Ass'n*,
  509 F. App'x 367 (5th Cir. 2013) ..................................................................31

*Woodis v. Oklahoma Gas & Elec. Co.*,
  704 P.2d 483 (Okla. 1985)..........................................................................12

## Statutes / Rules

17 O.S. § 151 ......................................................................................................18

17 O.S. § 152 ......................................................................................................17

Fed. R. Civ. P. 56 ...........................................................................................1, 26

Tex. Bus. & Com. Code Ann. § 2.615 ........................................................21, 39

Tex. Bus. & Com. Code Ann. § 2.703 ..............................................................40

## Other Authorities

Fed. Energy Regul. Comm'n, N. Am. Elec. Reliability Corp., & Reg'l Entities, FERC, NERC and Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 16, 2021), available at https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and ...............................................13

HF Sinclair Corp., *Company History*, https://www.hfsinclair.com/about-us/company-history/default.aspx ..............................................................4

HollyFrontier Co., 2021 Annual Report (Form 10-K) (Feb. 23, 2022)...........................4, 11

NextEra Energy Resources, LLC *What We Do: Energy Marketing Services* (2024), https://www.nexteraenergyresources.com/what-we-do/energy-marketing.html ...............................................................................5

N. Am. Elec. Reliability Corp., *February 2021 Cold Weather Grid Operations: Preliminary Findings and Recommendations* (Sept. 23, 2021), https://www.ferc.gov/media/february-2021-cold-weather-grid-operations-preliminary-findings-and-recommendations-full......................12, 13, 27

Okla. Corp. Comm'n Pub. Util. Div., *Deep Freeze 2021 FAQ*, https://oklahoma.gov/occ/divisions/public-utility/consumer-services/deep-freeze-2021-faq.html......................................................13, 16, 29

Okla. Natural Gas, *New Customer Welcome: Welcome to the Neighborhood*, https://www.oklahomanaturalgas.com/corporate/new-customer-welcome ...............................5

ONE Gas, *About ONE Gas*, https://www.onegas.com/about-one-gas/default.aspx......................5

ONEOK Gas Transportation, L.L.C., oneok.com, https://www.oneok.com/ogt ...........................5

Trent Jacobs, *Shale Consolidation: Cimarex and Cabot Merger Tops Busy Month
  for Sector Dealmakers*, J. Petrol. Tech. (May 24, 2021),
  https://jpt.spe.org/shale-consolidation-cimarex-and-cabot-merger-tops-busy-
  month-for-sector-dealmakers ....................................................................................................8

U.S. Energy Info. Admin., *Natural Gas Weekly Update* (Feb. 18, 2021),
  https://www.eia.gov/naturalgas/weekly/archivenew_ngwu/2021/02_18/ ........................16, 36

Defendant NextEra Energy Marketing, LLC ("NEM") moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment against Plaintiff HF Sinclair Refining & Marketing LLC (f/k/a HollyFrontier Refining & Marketing LLC) ("HFS").

## PRELIMINARY STATEMENT

HFS filed this action because it saw a dubious opportunity to net a windfall of $15 million, based on a spurious reading of a limited carve-out of the force majeure language in the parties' gas supply agreement. As there is no genuine dispute as to the material facts that underpin NEM's force majeure defense, the Court should enter summary judgment and dismiss HFS's claim.

NEM contracted to sell daily volumes of gas to HFS at a pooling location on a pipeline owned by nonparty ONEOK Gas Transportation, LLC ("OGT" and the "OGT Pool") to supply HFS's crude oil refineries in Tulsa, Oklahoma. In mid-February 2021, Winter Storm Uri ("Uri") brought life-threatening, record-low temperatures to Oklahoma, Texas, and neighboring states, causing catastrophic, declines in natural gas production and a spike in energy demand. The Governor of Oklahoma and the President of the United States both declared a state of emergency. Government authorities, including the Oklahoma Corporation Commission ("OCC"), as well as pipeline operators across the mid-continent, issued emergency decrees prioritizing the provision of gas to utilities serving human needs to safeguard life, health, and public safety.

Amid this emergency, NEM declared force majeure across all its gas contracts in the region and complied with applicable orders. At OGT Pool, NEM dutifully prioritized deliveries on its preexisting obligations to Oklahoma Natural Gas (the "ONG Utility" or "ONG"), a local utility serving hundreds of thousands of customers who were at risk of freezing in their homes.

NEM took reasonable steps to obtain extremely scarce gas and managed to deliver gas to HFS during much of the storm. However, on February 16–18, 2021, severe disruptions to the flow of gas prevented NEM from meeting its preexisting, priority obligations to the ONG Utility and

having enough left over to deliver to HFS.  As a matter of law, NEM's delivery obligations to HFS were excused by force majeure.  Moreover, on February 18, 2021, HFS wrongfully interfered with NEM's efforts to deliver gas, by unilaterally reducing the amount of gas it nominated for receipt, in violation of the parties' contract and contemporaneous understanding.  HFS's actions forced OGT to reduce the supply of gas that NEM obtained for delivery to HFS, and thereby caused the delivery cuts that HFS complains of.

Not one of these facts is in genuine dispute.  Applying the parties' agreement and Texas law to these undisputed facts warrants summary judgment for NEM on HFS's claim.

Importantly, HFS and its witnesses do not dispute that Uri gave rise to a force majeure under the widely-used Base Contract for Sale and Purchase of Natural Gas (the "Base Contract"), which states that force majeure includes, *inter alia*, "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe."  Nor is there any dispute that NEM provided adequate notice of force majeure to HFS.

Numerous state and federal courts have correctly found that Uri was a force majeure under the Base Contract.  Conditions affecting NEM's deliveries to HFS at OGT Pool were indisputably even more severe during the relevant period than the force majeure conditions at issue in other cases involving Winter Storm Uri.  The delivery problems on February 16, 2021 followed a federal holiday, which shuttered the next-day gas market.  When the market reopened, prices at OGT Pool soared to record-shattering levels, exceeding *by far* the highest price ever recorded for any major hub in the United States going back decades.

No witness disputes that it was HFS's own wrongful decision to reduce its receipt nomination on February 18, 2021, in violation of the parties' contract, which caused HFS not to receive the full 7,500 MMBtu that it alleges NEM should have delivered on that day.

Given these undisputed facts, the **sole issue** raised by HFS's claim is a straightforward question of contract interpretation that is ripe for summary judgment. HFS contends that carve-out language in Section 11.8 to the Base Contract prevents NEM from issuing a force majeure as long any gas traded at or near OGT Pool on February 16 or 17, 2021. Section 11.8 unambiguously states no such thing. It states:

> in no event shall an interruption in, failure of, or unavailability of Gas **from Seller's normal sources of Gas supply** be considered an event of Force Majeure under this Section 11 **as long as Gas is available and trading on the open market** at pools or hubs in Buyer's market area and **from which such Gas could readily be transported to Buyer's location**.

(Emphasis added).

HFS contends that Winter Storm Uri did not give rise to a force majeure under Section 11.8. However, Section 11.8 **does not** broadly require a party declaring force majeure to demonstrate that there was literally no gas in the market. Far from it, Section 11.8 is a narrow carve-out that only applies when a seller seeks to declare force majeure based on a disruption of its own "normal sources" of supply, and even then, only precludes force majeure under such circumstances when the market is functioning normally, *i.e.*, "Gas is available and trading on the open market" and "could be readily transported."

Consistent with decades of precedent in Texas and the Fifth Circuit, HFS's interpretation fails because it renders the Base Contract's other force majeure provisions superfluous and would improperly "make the force majeure clause redundant of the common law impossibility defense." *Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 718 (5th Cir. 2024) (district court was correct not to read the Base Contract's force majeure provision to require impossibility or to "render largely superfluous Section 11.3's list of events *excluded* from force majeure"); *see also Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 425 n.5 (5th Cir. 2013) (district court correctly "did not place much weight on [buyer's] argument," which "would make the force

majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world at any price"); *LNG Ams., Inc. v. Chevron Nat. Gas*, 2023 WL2920940, at \*8–10 (S.D. Tex. 2023) (interpreting force majeure carve-out to "only exclude[] loss-of-production events that are confined to a single gas producing region" and agreeing with *MIECO* that it is improper to read the phrase "prevented or restricted" to require impossibility); *Tejas Power Corp. v. Amerada Hess Corp.*, 1999 WL 605550, at \*3 (Tex. App. Aug. 12, 1999) ("Were we to adopt [buyer]'s interpretation of the contract, [seller's]s obligation would never be suspended; the force majeure clause would be meaningless. So long as gas could be procured anywhere in the world, at any price, [seller] would be obliged to meet its contractual obligations.").

## STATEMENT OF UNDISPUTED FACTS

### A.    The Parties and Relevant Non-Parties

Plaintiff HFS is a petroleum refiner that operates crude oil refineries in Tulsa, Oklahoma (the "Tulsa Refineries").[1]

Defendant NEM is one of the nation's leading electricity and natural gas marketers, based in Juno Beach, Florida.  NEM provides a wide range of electricity and gas commodity products, as well as marketing and trading services, to electric and gas utilities, municipalities, cooperatives, and other load-serving and electric generation facilities.[2]

---

[1] *See* HollyFrontier Co., 2021 Annual Report (Form 10-K) 18-19 (Feb. 23, 2022), available at https://s29.q4cdn.com/382181944/files/doc_financials/2021/ar/HF-Sinclair-2021-Annual-Report.pdf.    HFS was known as HollyFrontier Refining & Marketing LLC until it merged into HFS in 2023. *See Company History*, HF SINCLAIR, https://www.hfsinclair.com/about-us/company-history/default.aspx (last visited Oct. 25, 2024).

[2] *See What We Do: Energy Marketing Services*, NEXTERA ENERGY, (last visited Oct. 22, 2024), https://www.nexteraenergyresources.com/what-we-do/energy-marketing.html. *See also* App'x at 0192-0256, Ex. 6 (D. Caimes Dep. Tr.) at 7:2-6; 12:16-14:25; 30:24-33:21; App'x at 0369-0419, Ex. 9 (J. Palumbo Dep. Tr.) at 111:15-113:19; 117:17-118:24.

Non-party OGT owns the Oklahoma intrastate pipeline system through which the parties agreed to transport natural gas.[3]

Non-party ONG is Oklahoma's largest natural gas distributor and utility, providing gas directly to residential customers.[4] On June 3, 2020 and July 29, 2020, ONG purchased two options to receive gas from NEM (the "ONG Options") which expired on March 31, 2021.[5] ONG also operated a pipeline that HFS used to move the gas from OGT Pool to the Tulsa Refineries.[6]

### B.    The Contract

On August 1, 2017, NEM and HFS entered into a "Base Contract for Sale and Purchase of Natural Gas" published by the North American Energy Standards Board, Inc. ("NAESB"), together with "Special Provisions" (the "Base Contract").[7] Governed by Texas law, the Base Contract serves as a master agreement for natural gas transactions which are memorialized in short-form confirmations.[8] App'x at 0022-0025, Ex. 2 (the "Confirmation") (together with the Base Contract, the "Contract").

---

[3]  *See ONEOK Gas Transportation, L.L.C.*, ONEOK, https://www.oneok.com/ogt (last visited Oct. 25, 2024); *see also* App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 4.6.

[4]  *See About ONE Gas*, ONE GAS, https://www.onegas.com/about-one-gas/default.aspx (last visited Oct. 25, 2024); *New Customer Welcome: Welcome to the Neighborhood*, OKLA. NAT. GAS, https://www.oklahomanaturalgas.com/corporate/new-customer-welcome (last visited Oct. 25, 2024).

[5]  App'x at 0895-0897, Ex. 38 (June 3, 2020 NEM-ONG Confirmation); App'x at 0898-0901, Ex. 39 (July 29, 2020 NEM-ONG Confirmation); App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 149:21-151:1; *see also infra* Section E.

[6]  *See e.g.* App'x at 1012-1013, Ex. 49 (HFS_0000139) (listing "Upstream Nominations" from ███ and NextEra and "Downstream Nominations" to ONG); App'x at 0077-0159, Ex. 4 (M. Lokay Dep. Tr.) at 18:24-19:20.

[7]  App'x at 0001-0021, Ex. 1 (Base Contract).

[8]  App'x at 0001-0021, Ex. 1 (Base Contract). Transactions for the purchase or sale of gas can be executed on a "Firm" basis, which means "that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure." App'x at 0001-0021, Ex. 1 (Base Contract), § 2.19.

### C.    The Force Majeure Provisions

Section 11.1 of the Base Contract states that "neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure."[9]

As used in the Base Contract, "[t]he term 'Force Majeure' … means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2."[10]  Section 11.2 of the Base Contract states, in relevant part:

> Force Majeure shall include, ***but not be limited to***, the following:  (i) physical events such as ***acts of God***, … ***storms*** … which result in … (ii) ***weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe***;… and (v) ***governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction***.[11]

Section 11.3 of the Base Contract, in turn, carves out certain events and occurrences from the Force Majeure provision.[12]  While the parties did not amend Section 11.3, the Special Provisions include a limited, conditional carve-out in Section 11.8, which states:

> in no event shall an interruption in, failure of, or unavailability of Gas from, ***Seller's normal sources of Gas supply*** be considered an event of Force Majeure under this Section 11 as long as Gas ***is available and trading on the open market*** at pools or hubs in the Buyer's market area and from which such Gas could be ***readily transported*** to Buyer's location. [13]

---

[9]  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.1.  Section 11.5 of the Base Contract goes on to state that "[u]pon providing written notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure… ."  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.5.

[10]  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.1.

[11]  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.2 (emphasis added).

[12]  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.3.  Section 11.3 states, in relevant part:
> Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; . . . or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.

[13]  App'x at 0001-0021, Ex. 1 (Base Contract), § 11.8 (emphasis added).

HFS copied this provision wholesale from a prior contract it had with ████████████

("████████").[14] Unlike NEM, ████████ is a gas producer, so its "normal sources" were its wells

and/or processing facilities.[15]

### D.    The Transaction Confirmation

NEM and HFS entered into a Confirmation on September 22, 2020 that obligated NEM to

deliver 15,000 MMBtu per day of gas (the "Contract Quantity") to HFS from November 1, 2020

through March 31, 2021 at OGT Pool.[16] Under the Confirmation, the first 7,500 MMBtu daily

quantity (the "FOM tranche") was priced at first of month ("FOM") pricing, minus a spread of

$0.12 per MMBtu.[17] That price was $2.63 per MMBtu in February 2021.[18] The remaining tranche

of 7,500 MMBtu (the "Gas Daily Tranche") was priced at the higher of (i) FOM, or (ii) a daily

price published by *Platts Gas Daily* ("OGT Pool GD").[19] That price climbed as high as $1,193.15

per MMBtu on February 18, 2021.[20]

The Confirmation also granted HFS the option to sell up to the full Contract Quantity

(15,000 MMBtu per day) back to NEM. However, this "Sellback" could only be effected if HFS

"notif[ied] NEM no later than 9:00 AM Eastern Standard Time on the Business Day *prior* to the

---

[14] *See* App'x at 0922-0939, Ex. 43 (HFS-████ Contract), § 11.8.

[15] App'x at 0026-0076, Ex. 3 (A. Smedley Dep. Tr.) at 56:12-57:5; *see also* ████████████████████████

████████████████████████████████████████████████████████████████████. *Compare*
App'x at 0922-0939, Ex. 43 (HFS-████ Contract), § 11.8, *with* App'x at 0001-0021, Ex. 1 (Base Contract), § 11.8.

[16] App'x at 0022-0025, Ex. 2 (Confirmation) (together with the Base Agreement, the "Contract"); App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶¶ 5.6-5.10; App'x at 0706-0760, Ex. 15 (D. Lerman Report), § 6.3; *see also* App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 4.7.

[17] App'x at 0022-0025, Ex. 2 (Confirmation) at -269. This FOM price was a price published by *Platts Inside FERC* ("OGT Pool IFERC") on the first day of each month.

[18] App'x at 0855-0856, Ex. 35 (HFS_0002016) at Tab "TULSA EAST," Col. J, Rows 17-44.

[19] App'x at 0022-0025, Ex. 2 (Confirmation) at -269.

[20] App'x at 1069-1095, Ex. 55 (Platts Daily for Flow Day 18) at -653 ("Final Daily Price Survey – Platts Locations ($/mmBtu)," "Midcontinent," "Oneok, Okla.," "Midpoint"); *see also* App'x at 0855-0856, Ex. 35 (HFS_0002016) at Tab "TULSA EAST," Col. N, Rows 32-34.

Gas Flow Day of its intent to exercise the Sellback and the quantity of the Sellback for such day"

(the "Sellback Deadline").[21]

### E.    The ONG Options

On June 3 and July 29, 2020, respectively, NEM was awarded the ONG Options, pursuant

to which ONG could call on NEM to deliver up to three 50,000 MMBtu tranches of gas to the

ONG Utility at Gas Daily prices (with minor adjustments), and one tranche of 15,000 MMBtu at

FOM pricing.[22]  The term of the ONG Options ran through March 31, 2021.[23]

### F.    HFS's Refineries

HFS used the gas it purchased from NEM as fuel for its two refineries in Tulsa,

Oklahoma.[24]  The Tulsa Refineries take in crude oil and other basic feedstocks and generate

various products such as gasoline, diesel fuel, jet fuel, and modified asphalt.[25]  In February 2021,

the gas that HFS purchased from suppliers such as NEM and ▮▮▮▮ at OGT Pool was delivered to

the ONG pipeline, which served as transport to move the gas from OGT Pool to the Tulsa Refineries.[26]

---

[21]  App'x at 0022-0025, Ex. 2 (Confirmation) at -270 (emphasis added).

[22]  App'x at 0895-0897, Ex. 38 (June 3, 2020 NEM-ONG Confirmation); App'x at 0898-0901, Ex. 39 (July 29, 2020 NEM-ONG Confirmation); App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 98:24-99:10.

[23]  App'x at 0895-0897, Ex. 38 (June 3, 2020 NEM-ONG Confirmation); App'x at 0898-0901, Ex. 39 (July 29, 2020 NEM-ONG Confirmation).

[24]  *See* App'x at 0026-0076, Ex. 3 (A. Smedley Dep. Tr.) at 86:16-88:13, at 104:18-105:9 ▮▮▮▮
▮▮▮▮ ); App'x at 0077-0159, Ex. 4
(M. Lokay Dep. Tr.) at 61:8-15, 106:9-107:1 ▮▮▮▮
▮▮▮▮ ); App'x at 0855-0856, Ex. 35 (HFS_0002016) at Tabs "TULSA EAST" and "TULSA WEST" Col. AY-BE, Rows 17-44; App'x at 0946-0948, Ex. 45 (Gas Day 16 Shift Report) (showing natural gas usage level on Feb. 16 as reported by East Refinery shift supervisor James Dunn).

[25]  *See* App'x at 0026-0076, Ex. 3 (A. Smedley Dep. Tr.) at 12:15-13:19; App'x at 0160-0191, Ex. 5 (F. Dunbar Dep. Tr.) at 17:2-19:5; App'x at 0077-0159, Ex. 4 (M. Lokay Dep. Tr.) at 18:5-21; *see also* HollyFrontier Co., 2021 Annual Report (Form 10-K) 11-12 (Feb. 23, 2022), available at https://s29.q4cdn.com/382181944/files/doc_financials/2021/ar/HF-Sinclair-2021-Annual-Report.pdf. In addition to natural gas and crude oil, in February 2021, HFS also had the ability to fuel the Tulsa Refineries with propane, and possibly other fuel sources. *See* App'x at 0026-0076, Ex. 3 (A. Smedley Dep. Tr.) at 135:4-10 ▮▮▮▮ ); *See* App'x at 0077-0159, Ex. 4 (M. Lokay Dep. Tr.) at 74:2-18 ▮▮▮▮
▮▮▮▮ .

[26]  *See, e.g.,* App'x at 1012-1013, Ex. 49 (HFS_0000139) (listing "Upstream Nominations" from Cimarex and NextEra and "Downstream Nominations" to ONG).

## G.    The Uri Weather Event

Uri had a catastrophic impact on both natural gas production and the flow of natural gas in the United States. Freezing temperatures spiked extreme demand at the same time that they constrained supply in ways that were unprecedented in their duration and scope.[27]  Indeed, the United States experienced the largest monthly decline of natural gas production on record, falling a staggering 28% from approximately 90.8 billion cubic feet ("Bcf") of production on February 4, 2021, to 65.4 Bcf on February 17, 2021.[28]  Effects were particularly severe in Oklahoma, where natural gas production declined approximately 57%.[29]

In response to these extreme conditions, Oklahoma Governor Kevin Stitt issued Executive Order 2021-06, declaring a "disaster emergency caused by severe winter weather in all 77 Oklahoma counties that threatens the publics peace, health, and safety."[30]

On February 12, 2021, with the weather worsening, ONG called on the ONG Options and continued to exercise its right to seek the delivery of the full 165,000 MMBtu available under the

---

[27]  *February 2021 Cold Weather Grid Operations: Preliminary Findings and Recommendations*, N. AM. ELEC. RELIABILITY CORP. (Sept. 23, 2021), https://www.ferc.gov/media/february-2021-cold-weather-grid-operations-preliminary-findings-and-recommendations-full); Deep Freeze 2021 FAQ, OKLA. CORP. COMM'N PUB. UTIL. DIV., https://oklahoma.gov/occ/divisions/public-utility/consumer-services/deep-freeze-2021-faq.html (last modified July 7, 2023); see also App'x 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 103:3-7

[28]  N. Am. Electric Reliability Corp., "February 2021 Cold Weather Grid Operations: Preliminary Findings and Recommendations," Sep. 23, 2021, page 3 (https://www.ferc.gov/media/february-2021-cold-weather-gridoperations-preliminary-findings-and-recommendations-full).

[29]  App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 6.12; FERC, NERC, and Regional Entity Joint Staff Report, *The February 2021 Cold Weather Outages in Texas and the South Central United States* 174 (Nov. 2021), (https://www.ferc.gov/media/february-2021-coldweather-outages-texas-and-south-central-united-states-ferc-nerc-and).

[30]  App'x at 0761-0764, Ex. 16 (Feb. 12, 2021 Okla. Exec. Ord. 2021-06) at -620; *see also* App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 186:13-25 (describing how NEM considered Governor Stitt's order in deciding to prioritize human needs); App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 145:1-146:18  (opining that prioritizing human needs is commercially reasonable in the context of the emergency declaration).

ONG Options through February 17.[31] ONG reduced its called-on amount to 115,000 MMBtu for February 18, 2021.[32]

To meet these obligations and those of its other baseload customers on OGT, NEM purchased sufficient gas to supply both ONG and its entire customer pool at OGT Pool and also diverted additional gas that it contracted for with BCE-Mach III, LLC ("Mach") from Panhandle Eastern Pipeline to OGT Pool.[33]

On February 13, 2021, ONG's distribution pipeline also sent a curtailment order (the "ONG Curtailment Order") to its nonresidential customers, including HFS, ordering those customers to reduce usage to "conserve gas for residential and human needs customers."[34]

On February 14, 2021, NEM issued its first notice of force majeure to HFS, which advised:

> [t]his letter shall serve as written notice that a Force Majeure event as described in the agreement between [NEM] and the entity receiving this Notice, is currently occurring within … Louisiana, Oklahoma and Texas …. NEM is declaring a Force Majeure event under the agreement and may not be able to deliver or receive certain Gas quantities, in whole or in part, beginning February 10, 2021 and continuing

---

[31] *See* App'x at 0949-0995, Ex. 46 (Irwin Buys & Sells Book); App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tabs "feb 12," Col. K, Row 52. App'x at 0257-0310, Ex. 7 (K. Brown Dep. Tr.) at 74:5-15; 77:4-13; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 82:16-83:18; App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 160:22-161:22, 197:4-198:16; App'x at 0949-0995, Ex. 46 (Irwin Buys & Sells Book); App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tabs "feb 12," Col. K, Row 52; "feb 13," Col K, Row 62; "feb 14," Col. K, Row 30; "feb 15," Col. K, Row 32; "feb 16," Col. 16, Row 30; "feb 17," Col. K, Row 28.

[32] *See* App'x at 0949-0995, Ex. 46 (Irwin Buys & Sells Book); App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tab "feb 18," Col. K, Row 28. A "Gas Day" or "GD" is the 24-hour period which is specified within a pipeline's publicly available tariff starting at 9:00 a.m. and ending at 9:00 a.m. the following day. For each Gas Day there are multiple windows during which nominations can be made by a shipper which are commonly referred to as nomination cycles. App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 4.32.

[33] App'x 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 72:11-73:13;88:8-20 (testifying that Irwin arranged transport of gas from Mach to OGT Pool); App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 102:7-104-3 (describing diversion of gas from Panhandle).

[34] App'x at 0765-0768, Ex. 17 (ONG Curtailment Order) at -080. HFS was one of ONG's nonresidential customers that received the February 13, 2021 Curtailment Order. App'x at 0765-0768, Ex. 17 (ONG Curtailment Order) at -078; App'x at 0077-0159, Ex. 4 (M. Lokay Dep. Tr.) at 93:19-96:6 (describing her awareness and consideration of the ONG Curtailment Order); App'x at 0026-0076, Ex. 3 (A. Smedley Dep. Tr.) at 179:20-181:15. At her deposition, Ms. Lokay agreed that HFS did not serve human needs. App'x at 0077-0159, Ex. 4 (M. Lokay Dep. Tr.) at 21:18-22:13 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ).

until further notice.[35]

NEM sent an updated notice of force majeure on February 16, 2021, providing additional details. *See* App'x at 0797-0799, Ex. 25 (Feb. 16, 2021 NEM Force Majeure) at -147.[36]

The most severe impacts of Uri were from February 15 through February 18, 2021.[37]  At OGT Pool (the specific location where HFS contracted to receive gas), the market was so illiquid and dislocated that prices averaged $1,192/MMBtu for gas flowing on February 18, which was not only "the highest in the country," but also "the highest price on record by far for any major hub going back to 1993."[38]  Indeed, $368.33/MMBtu and $944.00/MMBtu, the prices for gas flowing on February 16 and 17 at OGT Pool were, respectively, ***over 100 to nearly 350 times*** more than the cost of gas earlier in the month.[39]

On February 15, 2021, OGT issued an Operational Flow Order ("OFO") which alerted "all system receipt point operators" that nominations would be strictly matched to flowing quantities.[40]

On February 16, 2021, the OCC put into effect an Emergency Order stating that:

---

[35]  App'x at 0794-0796, Ex. 24 (Feb. 14, 2021 NEM Force Majeure) at -088.

[36]  This updated notice continued to notice a widescale force majeure, stating:

> due to severe weather caused by Winter Storm Uri in a large geographic area of the U.S[.] (including, but not limited to…Oklahoma… including without limitation extraordinary freezing temperatures[)], a Force Majeure event as defined [in] Section 11.2(ii) of the North American Base Agreement for Sale and Purchase of Natural Gas (as modified by the Special Provisions thereto) ... has occurred beginning on February 11, 2021 and is continuing until further notice.  as of the date of this letter, multiple pipelines have been severely impacted, and many production facilities, gas processing facilities and wells in the region have suffered freeze-outs and failures due to the extremely low temperatures…

App'x 0797-0799, Ex. 25 (Feb. 16, 2021 NEM Force Majeure) at -147.

[37]  *Deep Freeze 2021 FAQ*, OKLA. CORP. COMM'N PUB. UTIL. DIV., https://oklahoma.gov/occ/divisions/public-utility/consumer-services/deep-freeze-2021-faq.html (last modified July 7, 2023).

[38]  *Natural      Gas      Weekly      Update*,      U.S.      ENERGY      INFO.      ADMIN., https://www.eia.gov/naturalgas/weekly/archivenew_ngwu/2021/02_18/ (Feb. 18, 2021) (emphasis added).  *See also* App'x at 1069-1095, Ex. 55 (Platts Daily for Flow Day 18) at -653. The prices for gas flowing on February 18 at OGT Pool was $1,193.15/MMBtu.

[39]  *See* App'x at 1023-1046, Ex. 53 (Platts Daily for Flow Days 13-16) at -737; On February 17, the spot price of gas at OGT Pool was $944.00 per MMBtu.  *See* App'x at 1047-1068, Ex. 54 (Platts Daily for Flow Day 17) at -773.

[40]  App'x at 0792-0793, Ex. 23 (Feb. 15, 2021 OGT Operational Flow Order); App'x at 1010-1011, Ex. 48 (Feb. 15, 2021 Update to OGT Operational Flow Order).

In response to the 2021 Winter Weather Event, the Commission orders that, to the extent practicable, natural gas and electric utilities shall, in a manner consistent with Commission rules, prioritize the delivery of natural gas to their customers as follows:

1. Deliveries of natural gas and electricity services necessary for life, health, and public safety.

2. Deliveries of natural gas to electric generation facilities that serve human needs customers.[41]

As of and after the morning of February 16, 2021, the NEM commercial gas trading team had in front of it both numerous concurrent government orders issued in Oklahoma, Texas and Kansas that established human-need priorities relating to gas deliveries, and numerous orders issued by pipelines and transmission organizations operating in Oklahoma establishing human needs.[42] The NEM commercial gas trading team also reasonably believed NEM subject to the OCC Order No. 716952 concerning how utilities and those providing gas to utilities from producers like Mach and other counterparties were to prioritize human needs.[43]

---

[41] *See* App'x at 0788-0791, Ex. 22 (OCC Order No. 716952) at -426. The OCC is the public utilities commission of the state of Oklahoma and "has jurisdiction of the subject matter and has authority pursuant to Article IX, § 18, of the Oklahoma Constitution and 17 O.S. § 152."[41] As such, the OCC has jurisdiction over OGT Pool, which is located in Oklahoma, and its orders have the "effect of law." *See* Article IX, § 18, of the Oklahoma Constitution; 17 O.S. § 152; *see also Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1384 (10th Cir. 1989) (finding that defendants' violations of the OCC's rules supported affirming an award of punitive damages); *Woodis v. Oklahoma Gas & Elec. Co.*, 704 P.2d 483, 486 (Okla. 1985) (affirming a finding of negligence per se for violations of the "National Electrical Safety code," for which compliance is "required by order of the [Oklahoma] Corporation Commission").

[42] *See* App'x at 0192-0256, Ex. 6 (D. Cairns Dep. Tr.) at 186:13-25; 197:18-199:19 (NEM considered pipeline and governmental orders in deciding to prioritize human needs); App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 76:6-77:5; 82:16-83:18 ▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓; App'x at 0369-0419, Ex. 9 (J. Palumbo Dep. Tr.) at 121:14-122:9; App'x at 0257-0310, Ex. 7 (K. Brown Dep. Tr.) at 74:5-15; 77:4-13; App'x at 0771-0779, Ex. 19 (February 15, 2021 Kansas State Corporation Commission Emergency Order); App'x at 0769-0770, Ex. 18 (February 17, 2021 Texas Railroad Commission Natural Gas Order); Press Release, The White House, President Joseph R. Biden, Jr. Approves Oklahoma Emergency Declaration (Feb. 18, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/18/president-joseph-r-biden-jr-approves-oklahoma-emergency-declaration/; App'x at 0784-0787, Ex. 21 (February 15, 2021 Southwest Power Pool Emergency Alerts); App'x at 0780-0783, Ex. 20 (February 16, 2021 EGT Critical Notice No. 4416) at -527; App'x at 0765-0768, Ex. 17 (ONG Curtailment Order) at -080.

[43] Under the relevant rules and statutes, NEM believed that it was subject to OCC Order No. 716952 and thus prioritized ONG. *See* App'x at 0192-0256, Ex. 6 (D. Cairns Dep. Tr.) at 18:5-21:3; 23:24-28:21; 196:21-199:24; App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 135:4-142:22; App'x at 0906-0911, Ex. 41 (OAC 165:45) at 5;

## H.    NEM's Efforts to Overcome the Force Majeure

On February 16, 17, and 18, NEM contracted to receive sufficient gas, had it flowed, to meet its obligation to all of its counterparties on OGT.[44]  In addition to its baseload and Mach supply, NEM purchased gas on the spot market at the extremely inflated prices gas reached during Uri.[45]  Even though NEM did everything it could, given how illiquid and severely dislocated OGT was on February 16, 17 and 18, 2021, NEM was able to identify very little gas for purchase, and even less than what NEM was able to purchase flowed.[46]  As NEM's trader at OGT, Rob Irwin, explained at his deposition while NEM "did everything we could to purchase gas" on February 17, "the market… was broken;" "there was no liquidity" and there was "[v]ery little gas out there to buy."[47]

It is common market practice for sellers in force majeure circumstances to allocate their gas supply in a manner consistent with governmental orders and pipeline directives, as well as to

---

App'x at 0902-0905, Ex. 40 (17 Okl. Stat. Ann. § 151 (2021)) at 1; App'x at 0902-0905, Ex. 40 (52 Okl. Stat. Ann. § 36.1 (2021)) at 3.  During Uri, NEM purchased gas from Mach at the Lincoln Plant production facility and transported that gas to OGT Pool.  App'x at 0940-0945, Ex. 44 (NEM Gas Day 15, ID3 OGT Scheduled Quantity Report) at -342. App'x 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 72:5-73:13, at 88:8-20 (testifying that Irwin arranged transport of gas from Mach to OGT Pool); App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 102:7-104-3 (describing diversion of gas from Panhandle).

[44]  *See* App'x at 0949-0995, Ex. 46 (Irwin Buys & Sells Book); App'x at 0996-1009, Ex. 47 (NEM_HFS0000065); App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 71:12-73:17 ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ).  On February 16, 2021, NEM's delivery shortfall to ONG was 33,308 MMBtu.  App'x at 1014-1016, Ex. 50 (NEM Gas Day 16, ID3 Scheduled Quantity Report) at -351.  On February 17, NEM's delivery shortfall to ONG was 52,781 MMBtu.  App'x at 1017-1019, Ex. 51 (NEM Gas Day 17, ID3 Scheduled Quantity Report) at -363.  App'x at 0940-0945, Ex. 44 (NEM Gas Day 15, ID3 OGT Scheduled Quantity Report) at -342.

[45]  *See* App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 89:17-23 ("We did everything we could to purchase gas … We bought fixed-price gas, we bought gas daily gas … We bought everything that we could find that people would sell us."); App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 72:11-73:5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ).

[46]  App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 87:24-89:8 (discussing Feb. 16, "There was no market to go out and buy any kind of intraday gas for the OGT pool that was available to us"); App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 72:11-77:4, at 88:5-92:4.

[47]  App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 89:10-23.

counterparties providing services necessary for sustaining human life.[48] In accordance with OCC Order No. 716952 and the numerous other human-needs directives and orders, between February 16 and 18 NEM prioritized deliveries to ONG which directly serviced residential customers.[49] NEM supplied the remainder of its gas at OGT Pool to its other customers such as HFS (which NEM ranked second, right after ONG).[50] During Uri, however, NEM lost approximately 37% of its baseload supply,[51] and was unable to deliver full contract volumes to ONG on February 16 to

---

[48] *See* App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 7.20; App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 136:6-140:9; *see also Tejas Power Corp. v. Amerada Hess Corp.*, 1999 WL 605550 at *2 (Tex. App. Aug. 12, 1999) (upholding trial court finding that defendant's allocation was fair and reasonable where defendant ranked local distribution companies at a higher priority for delivery than plaintiff); *LNG Americas, Inc.*, 2023 WL 2920940, at *10 (noting that Tex. Bus. & Com. Code Ann. § 2.615 expressly allows a seller to allocate production to "regular customers not then under contract" under the "fair and reasonable" standard) (quotations omitted).

[49] *See* App'x at 0257-0310, Ex. 7 (K. Brown Dep. Tr.) at 74:5-15; 77:4-13; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 82:16-83:18; App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 197:18-199:19. For each of February 16, 17, and 18, NEM ranked ONG "1" for delivery at OGT Pool. *See* App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) 189:6-10

: App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 144:12-153:17

; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 76:6-77:5

App'x at 0369-0419, Ex. 9 (J. Palumbo Dep. Tr.) at 121:14-122:9; App'x at 0800-0813, Ex. 26 (NEM ID3 Delivery Rankings for Gas Days 16-18) at –289 (for Gas Day 16), -284 (for Gas Day 17), -299 (for Gas Day 18); App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 173:20-174:7

; 163:4-22

to HollyFrontier); App'x at 0311-0368, Ex. 8 (R. Irwin. Dep. Tr.) at 76:6-21 (HFS did not receive full delivery on Gas Day 16 and 17 because NextEra was which was ONG and human-needs customers).

[50] App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tab "feb 18."; App'x at 1014-1016, Ex. 50 (NEM Gas Day 16, ID3 Scheduled Quantity Report) at -351; App'x at 1017-1019, Ex. 51 (NEM Gas Day 17, ID3 Scheduled Quantity Report) at -362; App'x at 1020-1022, Ex. 52 (NEM Gas Day 18, ID3 Scheduled Quantity Report) at -372; App'x at 0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 204:24-205:5

; App'x at 0800-0813, Ex. 26 (NEM ID3 Delivery Rankings for Gas Days 16-18) at –289 (for Gas Day 16), -284 (for Gas Day 17), -299 (for Gas Day 18).

[51] App'x at 0653-0705, Ex. 14 (J. Broxson Report), ¶ 6.27.

18,[52] and thus was unable to deliver any gas to HFS or its other customers at OGT Pool for the same period.[53]

## I. HFS's Ineffective Purported Sellback on February 18, 2021

On February 18, 2021, NEM only delivered 3,163 MMBtu of the 7500 MMBtu of the FOM tranche HFS nominated to receive.[54] The record, however, indisputably establishes that was HFS, not NEM, that caused HFS to not receive the full amount on February 18 by unilaterally changing its nomination.[55]

On February 18, 2021 at approximately 10:00 A.M. EST, HFS's trader, Michelle Lokay, attempted to sell back 7,500 MMBtu for Gas Day 18 to NEM.[56] NEM's trader, Rob Irwin, unambiguously rejected the untimely request, which was over 24 hours late.[57] Nevertheless, just before 11:00 A.M. EST, HFS improperly reduced its nomination from 15,000 MMBtu to

---

[52]  On February 16, the spot price of gas at OGT Pool was $368.33 per MMBtu, and NEM's delivery shortfall to ONG was 33,308 MMBtu. *See* App'x at 1023-1046, Ex. 53 (Platts Daily for Flow Days 13-16) at -737; App'x at 1014-1016, Ex. 50 (NEM Gas Day 16, ID3 Scheduled Quantity Report) at -351. On February 17, the spot price of gas at OGT Pool was $944.00 per MMBtu and NEM's delivery shortfall to ONG was 52,781 MMBtu. *See* App'x at 1047-1068, Ex. 54 (Platts Daily for Flow Day 17) at -773; App'x at 1017-1019, Ex. 51 (NEM Gas Day 17, ID3 Scheduled Quantity Report) at -362.

[53]  *See* App'x at 0800-0813, Ex. 26 (NEM ID3 Delivery Rankings for Gas Days 16-18) at –289 (for Gas Day 16), -284 (for Gas Day 17); App'x at 1014-1016, Ex. 50 (NEM Gas Day 16, ID3 Scheduled Quantity Report) at -351; App'x at 1017-1019, Ex. 51 (NEM Gas Day 17, ID3 Scheduled Quantity Report) at -362.

[54]  App'x at 0949-0995, Ex. 46 (Irwin Buys & Sells Book); App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tab "feb 18," Col. S, Row 28; App'x at 0800-0813, Ex. 26 (NEM ID3 Delivery Rankings for Gas Days 16-18) at -299 (for Gas Day 18).

[55]  App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 323:10-324:21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[56]  App'x at 0822-0829, Ex. 31 (M. Lokay and R. Irwin Feb. 18, 2021 ICE Chats) at -387; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 172:6-180:18.

[57]  Pursuant to the Confirmation, the Sellback Deadline for Gas Day 18 was 9:00 A.M. EST on February 17, 2021. App'x at 0022-0025, Ex. 2 (Confirmation) at -270. App'x at 0822-0829, Ex. 31 (M. Lokay and R. Irwin Feb. 18, 2021 ICE Chats) at -388; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 193:9-194:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 324:15-324:21.

7,500 MMBtu for the final two cycles of Gas Day 18,[58] which in turn created a mismatch in nominated quantities between NEM's upstream and downstream obligations, otherwise known as a pool imbalance.[59] Because, as HFS's trader knew, the lesser of the two nominated amounts is the number that OGT utilized to determine the amount that NEM could deliver to HFS, OGT reduced NEM's upstream supply to balance NEM's upstream and downstream nominations.[60] On the evening of February 18, Rob Irwin notified Michelle Lokay that her reduced nomination was causing upstream supply cuts. App'x at 0822-0829, Ex. 31 (M. Lokay and R. Irwin Feb. 18, 2021 ICE Chats) at -390 ("your nom reduction is cuttin[g] our [s]uppliers… please put it back in").

Data from the pipeline as well as communications between NEM's trader and a representative of OGT establish that HFS's nomination reduction directly led OGT to cut NEM's deliveries to HFS on Gas Day 18 by at least 7,500 MMBtu.[61] Since HFS was ranked second to receive gas from NEM at OGT Pool on Gas Day 18, and ONG received all of its contracted-for volumes on Gas Day 18,[62]

---

[58] App'x at 0830-0847, Ex. 32 (M. Lokay ICE Chats with NEM employees Feb. 11-22, 2021) at 11-14; App'x at 0852-0854, Ex. 34 (NEM OGT Imbalance Report for February 18) at -242; App'x at 0820-0821, Ex. 30 (HFS Scheduled Quantity Report for Gas Day 18, Evening Cycle).

[59] App'x at 0830-0847, Ex. 32 (M. Lokay ICE Chats with NEM employees Feb. 11-22, 2021) at 11-14; App'x at 0311-0368, Ex. 8 (R. Irwin Dep. Tr.) at 179:3-20; App'x at 0257-0310, Ex. 7 (K. Brown Dep. Tr.) at 113:3-7; App'x at 0848-0851, Ex. 33 (HFS Scheduled Quantity Reports for GD18 Cycles ID1 through ID3) at -262; App'x at 0852-0854, Ex. 34 (NEM OGT Imbalance Report for February 18) at -242; *see also* "Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Public Utilities," FEDERAL ENERGY REGULATORY COMMISSION at 68-9; 75, available at https://www.ferc.gov/sites/default/files/2020-06/RM14-2-000_0.pdf (establishing the nomination timeline for natural gas transmission scheduling on interstate pipelines).

[60] App'x at 0800-0813, Ex. 26 (NEM ID3 Delivery Rankings for Gas Days 16-18) at -299 (for Gas Day 18); App'x at 0822-0829, Ex. 31 (M. Lokay and R. Irwin Feb. 18, 2021 ICE Chats) at -390 (Lokay message stating, "will also keep the 15k nom in there for today in case any of that gas flows today").

[61] *See* App'x at 0311-0368 , Ex. 8 (R. Irwin Dep. Tr.) at 185:14-187:24

; App'x at

0822-0829, App'x at 0857-0859, Ex. 36 (R. Irwin and OGT representative Apr. 21, 2021 Chats) at -573 (OGT representative explaining that the -7,500 MMBtu imbalance with HFS on GD18 meant "that reduction was then path balanced back to your suppliers"); App'x at _0192-0256, Ex. 6 (D. Cairnes Dep. Tr.) at 214:21-219:6; App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 332:22-336:2;App'x at 0420-0486, Ex. 10 (J. Broxson Dep. Tr.) at 202:18-206:16

[62] *See* App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tab "feb 18."

had HFS not improperly reduced its nomination, it is indisputable that NEM would have delivered to HFS at least the full first 7,500 MMBtu tranche of the Confirmation priced at FOM.[63]

## LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; Fed. R. Civ. P. 56(c). "The party moving for summary judgment bears the initial responsibility of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact." *Rice v. Cornerstone Hosp. of W. Monroe, L.L.C.*, 674 Fed. Appx. 391, 392 (5th Cir. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)). To defeat a motion for summary judgment, the non-movant must, accordingly, "identify specific evidence in the record and articulate the precise manner in which that evidence supports his claim." *Endure Indus. Inc. v. Vizient Inc.*, 2024 WL 4449736, at *1 (N.D. Tex. Oct. 9, 2024) (citation and quotation omitted).

The Base Contract is governed by Texas law. App'x at 0001-0021, Ex. 1 (Base Contract) § 15.5. "Under Texas law, the elements of a breach of contract claim are: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract … and; (4) the plaintiff sustained damages due to the breach." *See Edrich v. Dallas Coll.*, 2023 WL 8606816, at *6 (N.D. Tex. Dec. 12, 2023). "When a court grants a summary judgment based on interpretation of a contract, the initial inquiry is whether the

---

[63] *See* App'x at 0996-1009, Ex. 47 (NEM_HFS0000065) at Tab "feb 18"; App'x at 0192-0256, Ex. 6 (D. Cairnes Dep Tr.) at 218:5-219:1

contract is ambiguous.  If the contract is not ambiguous, it may be interpreted as a matter of law, so summary judgment is generally appropriate." *Little v. First S. Prod. Credit Ass'n.*, 22 F.3d 1094, 1994 WL 198937 at *3 (5th Cir. 1994) (citation omitted).  Texas law provides that a contract is unambiguous when its "language can be given a certain or definite meaning." *Aperia Sols., Inc. v. eVance, Inc.*, 2023 WL 3441516, at *1 (N.D. Tex. May 12, 2023), *reconsideration denied,* 2024 WL 1257492 (N.D. Tex. Mar. 25, 2024).  "Lack of clarity does not create an ambiguity, and not every difference in the interpretation of a contract amounts to an ambiguity." *Id.* (citation and quotation omitted).  Instead, "an ambiguity arises when [a contract] is susceptible to more than one reasonable meaning after application of established rules of construction." *Id.* (citation and quotation omitted) (alteration in original).

## ARGUMENT

The record conclusively demonstrates NEM is entitled to summary judgment because (1) NEM's delivery obligations on February 16–18, 2021 were prevented by Uri, which was an adequately noticed "force majeure" under the Base Contract; and, (2) HFS would have received its full FOM supply of gas from NEM on February 18, 2021, had HFS not wrongfully reduced its nomination and caused the OGT pipeline to reduce the quantity delivered to HFS on that date.

## I.    WINTER STORM URI WAS A FORCE MAJEURE EVENT.

### A.    There Is No Dispute That Uri Constituted Force Majeure Under Section 11.2.

HFS has never disputed that Uri and its impacts on natural gas infrastructure were a force majeure as defined by Section 11.2 of the Base Contract.  Under Section 11.2, force majeure includes events such as a "storm … affecting an entire region," a "weather related event affecting an entire geographic region" with "low temperatures" resulting in "freezing or failure of wells or

lines of pipe" and "interruption and/or curtailment of Firm transportation."[64] Uri indisputably satisfies this definition. As has been recognized by numerous Texas courts, in February 2021 Uri "battered the Southern United States, disrupting … natural gas production across the region … The natural gas industry saw rapid well and pipeline freeze-offs that significantly limited production … in the surrounding area." *Mieco LLC*, 2023 WL 2064723 at *1–2.[65] Not only does HFS concede in its pleading that "Winter Storm Uri was undoubtedly a significant winter event that impacted the natural gas infrastructure,"[66] its expert witness David Lerman agreed that there was not a single Texas Court he was aware of that had found it was not a force majeure under any contract provision and he agreed the characteristics of Uri were consistent with what is set out in Section 11.2(iii).[67]

      **B.**      **There Is No Dispute that Uri Caused the Delivery Failures.**

Nor is there any dispute that Uri caused the delivery failures at issue. NEM bought sufficient gas to balance its upstream and downstream nominations at OGT Pool throughout Uri.[68]

---

[64]  *See supra* at 6.

[65]  *See also Targa Gas Mktg. LLC v. Mieco LLC*, 2023 WL 9546743, at *6 (S.D. Tex. Aug. 8, 2023) ("force majeure provisions apply to 'weather related events affecting an entire geographic region, such as low temperatures which cause freezing[],' which accurately describes Uri and its aftermath."); *Unit Petroleum Co. v. Koch Energy Servs.*, LLC, 2023 WL 4828375, at *1 (S.D. Tex. July 27, 2023) ("Uri brought snow, ice, and unusually cold temperatures to Texas and Oklahoma. Pipes froze, wells and meters were damaged…"); *Ark. Okla. Gas Corp. v. BP Energy Co.*, 2023 WL 3620746, at *2 (W.D. Ark. May 24, 2023) ("ice storms and unprecedentedly low temperatures … were extraordinarily persistent, causing an enormous drop in natural gas production"); *Luminant Energy Co. LLC v. Pub. Util. Comm'n of Texas*, 665 S.W.3d 166, 174 (Tex. App.—Austin 2023, pet. filed) (Uri "froze poorly winterized natural gas wellheads and gathering lines, nearly halving the supply"). "The largest impacts on natural gas production" were felt in Texas, Oklahoma, and Louisiana, with "production and transportation of natural gas" throughout Oklahoma, in particular, experiencing the severe effects of the "polar vortex as equipment 'froze off' in the extreme cold, limiting available supply," while "demand soared to record levels." *February 2021 Cold Weather Grid Operations: Preliminary Findings and Recommendations*, N. AM. ELEC. RELIABILITY CORP. (Sept. 23, 2021), https://www.ferc.gov/media/february-2021-cold-weather-grid-operations-preliminary-findings-and-recommendations-full); *Deep Freeze 2021 FAQ*, OKLA. CORP. COMM'N PUB. UTIL. DIV., https://oklahoma.gov/occ/divisions/public-utility/consumer-services/deep-freeze-2021-faq.html (last modified July 7, 2023).

[66]  *See* Pet. ¶ 13.

[67]  App'x. at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 51:22-52:13.

[68]  *See supra* at 13.

Therefore, had all NEM's suppliers flowed full contract quantities to NEM, NEM would have supplied full contract volumes to HFS. The reason gas did not flow was that Oklahoma (and surrounding states) experienced the "largest U.S. monthly decline of natural gas production on record."[69] The gas NEM purchased (including swing gas NEM bought on a day ahead basis on the spot market, which was limited given how illiquid the market was) did not flow, resulting in cuts to NEM's downstream customers. *Supra* at 13-13.

C.    **There Is No Dispute that NEM Gave HFS Adequate Notice of Force Majeure.**

Further, HFS does not dispute that NEM's force majeure notices were adequate under Section 11.5.[70] Nor could it. NEM's notices sent on February 14 and February 16 satisfied its obligations under Section 11.5, since the February 16 notice stated that NEM was experiencing a force majeure pursuant to Section 11.2(ii) of the parties' Contract due to the extreme weather conditions throughout Oklahoma and the surrounding region. *See supra* at 11; *see also Targa Gas Marketing LLC*, 2023 WL 9546743 at *6 (finding satisfactory a force majeure notice sent on February 17, 2021 meant to excuse Uri-related delivery failures between February 14-20, 2021 and that explained the party's "[n]atural gas suppliers are experiencing power outages" and there are "freeze offs" which are affecting the "gas supply").

II.    **HFS'S INCORRECT INTERPRETATION OF SECTION 11.8 DOES NOT RAISE A GENUINE ISSUE FOR TRIAL.**

A.    **NEM's Force Majeure Was Not Prevented By Section 11.8.**

HFS's claim hinges on the assertion that Uri was not a force majeure event under Section 11.8.

---

[69]    *February 2021 Cold Weather Grid Operations: Preliminary Findings and Recommendations*, N. AM. ELEC. RELIABILITY CORP. (Sept. 23, 2021), https://www.ferc.gov/media/february-2021-cold-weather-grid-operations-preliminary-findings-and-recommendations-full); *Deep Freeze 2021 FAQ*, OKLA. CORP. COMM'N PUB. UTIL. DIV., https://oklahoma.gov/occ/divisions/public-utility/consumer-services/deep-freeze-2021-faq.html (last modified July 7, 2023).

[70]    *See supra* at 11.

HFS's interpretation is inconsistent with the plain meaning of the provision and must be rejected as a matter of law.  By its express terms, Section 11.8 is limited to situations that only affect NEM's "normal sources of gas supply."  NEM's force majeure notice unambiguously described a wide-scale interruption, and not merely interruption of NEM's "normal sources of gas supply."  *See* App'x at 0797-0799, Ex. 25 (discussing "severe weather caused by Winter Storm Uri in a large geographic area of the U.S []including, but not limited to: Louisiana, Oklahoma, Mississippi, Arkansas, Georgia and Texas …."); *see also supra* at 11.

Putting aside the breadth of NEM's notice, it is equally indisputable that Uri was a wide-ranging event that caused substantial dislocation, illiquidity, and disruption across Oklahoma and other regions of the midcontinent.  Production across Oklahoma plummeted by *57%*, and NEM lost more than a third of its baseload gas supply.  *Supra* 9.  The illiquidity and dislocation of the OGT market was, indeed, so severe and widespread that prices reached a record high of almost $1,200—*or nearly 400 times the typical price per MMBtu*— at OGT Pool on February 18, 2021. *Supra* 11.

HFS tries to sidestep these realities by first reading "Seller's normal sources of gas supply" out of Section 11.8, and then rewriting 11.8 into a broad carveout that purportedly prevented NEM from declaring a force majeure if there was any gas available to purchase or deliver on OGT, no matter how *de minimis* or expensive.  Neither the plain language of Section 11.8, the overall structure and provisions of Sections 11.2 and 11.3, or well-settled precedent dictate this extreme result.

At the threshold, to read Section 11.8 as HFS wishes would improperly render the phrase "Seller's normal sources" meaningless. *LNG Americas* is instructive.  As here, in *LNG Americas* the buyer argued that a contractual carve-out removing a particular class of supply disruptions from the force majeure clause implied that the seller could never declare force majeure if even a

molecule of gas was available on the spot market. *See* 2023 WL 2920940 at *5. The buyer argued that the provision at issue—"Seller's delivery obligations under this Transaction Confirmation shall not be excused by a loss of, or fluctuations in, production from any particular Seller's gas producing region or wellhead," *id.* at *2—limited the seller's "right to declare force majeure based on any amount of lost production." *Id.* at *4. The Court disagreed, entering summary judgement for the seller, and rejecting the buyer's reading which "would require the entire phrase 'from any particular Seller's gas producing region or wellhead' to be superfluous." *Id.* at *5. The Court further held that "Uri was unambiguously a 'Force Majeure' … notwithstanding the availability of some spot market gas." *Id.* at *8.

It is also notable that the "normal source of supply" language came from HFS's contract with ▇▇▇▇▇ which, like the defendant in *LNG Americas* (and unlike NEM), was a producer of natural gas. *See supra* at 7; *LNG Americas*, 2023 WL 2920940 at *2, *9 n.69. In other words, ▇▇▇▇▇ operated "gas producing region[s]" and "wellhead[s]" and thus any curtailment of its "normal sources of Gas supply" would mean curtailment of its ability to extract gas from the ground. In the context in which it was originally drafted, "Seller's normal sources of supply" unambiguously meant "Seller's gas producing region or wellhead," and not a widespread supply disruption such as Uri.[71]

HFS's reading would also render various other aspects of the text and structure of the Base Contract's force majeure provisions superfluous and meaningless.

*First*, Section 11.8 requires not just that a seller's normal sources of gas is disrupted, but that other sources of gas in the area were not disrupted—*i.e.* normal sources being disrupted only prevents a seller from declaring a force majeure when other supplies of gas are otherwise

---

[71] Tellingly, HFS's counsel instructed their expert not to answer whether the phrase "normal sources of supply" mattered to his reading of Section 11.8, and if such a reading would change if he were to put his finger over it and thereby remove it from his interpretation. App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 89:8-94:9.

"*available and trading on the open market*" and "*could be readily transported to Buyer's location.*"[72]

Second, HFS's reading would render largely superfluous Section 11.3's list of events excluded from force majeure—such as "the ability to sell or purchase gas at a better price." Tellingly, HFS's own expert altogether conceded that HFS's proposed reading would render sections of 11.2 and 11.3 superfluous as in *Mieco* and *Ergon*.[73] If Section 11.8 required impossibility, as HFS suggests, there would be no need to single out such events as not rising to the level of force majeure. *See Mieco L.L.C.*, 109 F.4th at 718; *LNG Americas*, 2023 WL 2920940, at *5 (rejecting buyer's reading as it "would require the entire phrase 'from any particular Seller's gas producing region or wellhead' to be superfluous"); *see also iStick Cap. Mgmt., LLC v. Arena Ltd. SPV, LLC*, 2021 WL 3427327, at *4 (N.D. Tex. Aug. 5, 2021) (rejecting plaintiff's construction as "[t]he Court presumes that two sophisticated parties would not have included a superfluous [provision]") (citing *Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 454 (Tex. App.—Fort Worth Mar. 5, 2020)); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("[E]ach part of the contract should be given effect.").

Third, if the parties truly wished to eliminate NEM's right declare a force majeure if any gas were available to purchase and deliver on OGT, they would have overwritten Section 11 altogether, including Section 11.2's provision for "weather related events affecting an entire geographic region." Alternatively, the parties could have, as other parties have, amended Section

---

[72]   *See, e.g., Mieco LLC*, 2023 WL 2064723, at *9 (holding that "the force majeure provision in the Contract is unambiguous" and that Uri "constituted [a] force majeure under the Contract."); *LNG Americas, Inc.*, 2023 WL 2920940, at *4 (interpreting a near-identical force majeure provision to the one at issue and determining that there "is no dispute that under the Base Contract, Defendant could have declared force majeure during Uri" because of "weather related events affecting an entire geographic region"); *Targa Gas Mktg. LLC*, 2023 WL 9546743, at *6 (finding plaintiff's force majeure notice for Uri satisfactory under contract as Uri resulted in "[n]atural gas suppliers [] experiencing power outages" and "freeze offs" affecting supply).

[73]   App'x at 0487-0574, Ex. 11 (D. Lerman Dep. Tr.) at 103:20-104:25.

11.3, which lists circumstances under which "[n]either party shall be entitled to the benefit of the provisions of Force Majeure," to add that "interruption of specific supply or markets at 'pooling points' or 'hubs' without the hub or pooling point operator claiming Force Majeure" shall be such a circumstance.[74] They did no such thing.

*Fourth*, and perhaps most fatally, HFS's interpretation is contrary to a decade's worth of precedent in the Fifth Circuit and the Texas district courts categorically refusing to interpret force majeure clauses to require impossibility. Such a reading has, in fact, been rejected by every court that has considered it, because it is not only contrary to the plain meaning and internal consistency and coherence of the provisions at issue, but improperly collapses seller's bargained for force majeure defense into the distinctly separate impossibility defense afforded by common law.[75] This judicial aversion to conflating force majeure with impossibility traces back over a decade to the Fifth Circuit's seminal decision in *Ergon-West Virginia, Inc. v. Dynegy Mktg. & Trade*, which arose in the wake of hurricane Katrina. 706 F.3d at 425 n.5. There, the Fifth Circuit Court of Appeals rejected the buyer's argument that the seller could not declare force majeure because it "could still purchase gas on the spot market," despite the effects of Hurricane Katrina and Rita,

---

[74]  *Supra* 6.

[75]  *See, e.g., Ergon-W. Va., Inc.*, 706 F.3d at 425 n.5 (rejecting buyer's argument that there was no force majeure during Hurricane Katrina and Rita because seller "could still purchase gas on the spot market" as the argument renders the force majeure provisions essentially meaningless); *Tejas Power Corp.*, 1999 WL 605550, at *3 (declining to require a seller to purchase spot-market gas during a cold snap as "this is the very obligation that [the seller] sought to avoid by inclusion of the force majeure clause" to cover events such as "cold weather and the freezing gas wells"); *Marathon Oil*, 2023 WL 4032879, at *12–13 (rejecting argument that seller could not invoke force majeure even if it "could have" bought "replacement gas on the spot market"); *LNG Americas*, 2023 WL 2920940, at *7–8 (agreeing with seller that "delivery does not have to become literally impossible to excuse performance"); *Mieco LLC*, 2023 WL 2064723, at *6 ("Requiring a party to show true impossibility would render portions of the Force Majeure Section superfluous" and "would also make the force majeure provision essentially duplicative of the common law defense of impossibility"); *Marathon Oil Co. v. Koch Energy Servs., LLC*, 2023 WL 5167036, at *4 (S.D. Tex. July 27, 2023) (observing that buyer "cites no authority, in this Circuit or otherwise, obligating a seller to purchase replacement gas on the spot market under the circumstances" of Uri), report and recommendation adopted, 2023 WL 5310575 (S.D. Tex. Aug. 17, 2023). HFS's expert testified that he was not aware of a single case in Texas or applying Texas law wherein a court determined a seller cannot declare force majeure under similar contractual provisions. *Supra* 20.

observing that it "would make the force majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price." *Id.* And this is a deep-seated and well-founded resistance recently reaffirmed by the Fifth Circuit in *MIECO L.L.C.*, where the Court again concluded that a reading of the force majeure provision in that case that rendered it "redundant of the common law impossibility defense … is an unreasonable reading of the of the force majeure clause." *Mieco, L.L.C.*, 109 F.4th at 718. Numerous other courts have likewise affirmed the holding in *Ergon*. *See LNG Americas*, 2023 WL 2920940, at *8 n.66 ("Multiple courts have declined to read force majeure clauses as requiring unavailability of replacement gas, stating that the force majeure clause would be effectively meaningless.") (collecting cases); *Mieco LLC*, 2023 WL 2064723, at *6 ("Requiring a party to show true impossibility would render portions of the Force Majeure Section superfluous" and "would also make the force majeure provision essentially duplicative of the common law defense of impossibility") (citing *Ergon-W. Va.*, 706 F.3d at 424 n.5).

Nor is it unsurprising that HFS's theory that the existence of any available gas would defeat an otherwise valid force majeure declaration would yield absurd results. As the Court correctly explained in *LNG Americas*:

> Plaintiff's reading implies an absurd outcome during severe production losses. When there is not enough gas for all suppliers to meet their term deliveries, it becomes impossible for all of them to perform. But because they can purchase gas on the spot market, full performance by any *single* supplier remains technically possible. Therefore *none* of the suppliers could declare force majeure, even though an event had made it impossible to fill all the suppliers' obligations. Under this reading, for a loss-of-production event to completely excuse any one supplier's performance, it would have to eliminate 100% of its production feeding the [relevant] Pipeline *and 100% of every other supplier's production*. Multiple courts have declined to read force majeure clauses as requiring unavailability of replacement gas, stating that the force majeure clause would be effectively meaningless.

2023 WL 2920940, at *8 n.66 (emphasis in original) (collecting cases); *accord Marathon Oil Co.*

*v. Koch Energy Servs., LLC*, 2023 WL 4032879, at \*13 (S.D. Tex. May 8, 2023) ("This Court agrees with the courts which have declined to read the NAESB Force Majeure clause as requiring the impossibility of performance.") (collecting cases).

### B.     There Is No Genuine Dispute as to the Availability of Replacement Gas.

The plain meaning of Section 11.8 is that it prevents a party from declaring force majeure in a situation in which the market is functioning properly. As set forth above, post-*Ergon* precedent establishes that parties are not required to do more than is practicable.[76]  And here, the record conclusively demonstrates that it was not practicable to obtain and deliver gas at OGT Pool from February 16–18, 2021. *Supra* 1111-5. Natural gas production in Oklahoma fell *by 57%* during the storm. *Supra* 9. OGT was forced to issue multiple operational flow orders to maintain the integrity of the pipeline, as were other pipelines in Oklahoma. *Supra* 10-2. Trading volumes collapsed, while volumes purchased and nominated for delivery were not guaranteed to flow. *Supra* 13-5. At OGT Pool, the scarcity was so extreme that prices "averaged $1,192/MMBtu on February 17" (for flow on February 18) which was not only "the highest in the country," but also "the highest price on record by far for any major hub going back to 1993." *Supra* 11. Moreover, any gas that NEM could obtain could not be "readily transported" to HFS, as market participants were required to prioritize deliveries to customers serving human needs. *Supra* 10-12; 14. Given these undisputed facts, sufficient gas was simply not "available and trading on the open market" and "could [not] readily be transported to [HFS's] location,"[77] let alone in quantities sufficient to

---

[76] *See Supra* at 24-5. *See also Marathon Oil*, 2023 WL 4032879, at \*12–13 (rejecting argument that the seller could not invoke force majeure even assuming it "could have performed ... [by] buying replacement gas on the spot market"); *Marathon Oil Co. v. Koch Energy Servs.*, LLC, 2023 WL 5167036, at \*4 (S.D. Tex. July 27, 2023) (observing that buyer "cites no authority, in this Circuit or otherwise, obligating a seller to purchase replacement gas on the spot market under the circumstances" of Uri), *report and recommendation adopted*, 2023 WL 5310575 (S.D. Tex. Aug. 17, 2023).

[77] Pet. ¶ 13 (quoting Base Contract § 11.8).

supply NEM's commitments to both ONG and HFS.

Tellingly, HFS's principal basis for its assertion that Section 11.8's carve out was triggered is not admissible evidence suggesting any meaningful amounts of gas could have been purchased and actually delivered on OGT Pool during the relevant days, or that OGT Pool was otherwise liquid or properly functioning, but rather misleading hearsay allegations cherrypicked from an action pending between NEM and non-party Macquarie Energy, LLC ("Macquarie") governed by New York law.[78]  In the case between NEM and Macquarie, the seller (Macquarie) inexplicably failed to deliver gas to NEM between February 14–19, 2021,[79] twice as long as the force majeure period in this case.  Because NEM was able to deliver gas during much of that period (including to HFS), NEM alleged in its complaint against Macquarie that "OGT Pool remained an active market during the relevant period, and both the parties and other market participants were able, using reasonable efforts, to transact and deliver gas there between February 14 and 19, 2021."[80] This allegation is true—the OGT pipeline did not issue a force majeure during the relevant period, and despite OGT being dislocated and illiquid, small amounts of gas were available for purchase, and some of those small amounts did even, in fact, flow.

This does not, however, mean that when NEM suffered delivery cuts on February 16–17, 2021, it could supply gas to HFS, or that adequate gas was "***available and trading*** on the ***open market***" and "could ***readily be transported*** to [HFS's] location."[81]  Indeed, the evidence in indisputable that it was simply not possible, let alone practical, to obtain sufficient volumes on the open market to supply NEM's commitments to both the ONG Utility and HFS.  *Supra* 13-4.

---

[78]  *NextEra Energy Marketing, LLC v. Macquarie Energy LLC*, Case No. 1:22-cv-01345 (S.D.N.Y. 2022).

[79]  *See Macquarie* Compl. (ECF 1) ¶ 15.

[80]  *Macquarie* Compl. (ECF 1) ¶ 16.

[81]  Pet. ¶ 13 (emphasis added) (quoting Base Contract § 11.8).

### III.    HFS RAISES NO OTHER TRIABLE ISSUES AS TO FORCE MAJEURE.

### A.    There Is No Genuine Dispute as to NEM's Efforts to Resume Performance.

HFS does not allege that NEM breached its duties to "make reasonable efforts to avoid the adverse impacts of [the] Force Majeure and to resolve the event" and "resume performance … with reasonable dispatch,"[82] and the undisputed facts preclude such a claim.  The Base Contract does not require NEM to take every possible action to overcome the force majeure; it only requires reasonable efforts.[83]

The unrebutted evidence establishes that, as Uri approached, NEM sought to avoid its adverse impacts by purchasing gas in volumes equal to its downstream commitments, and by ranking HFS ahead of NEM's other customers.  *Supra* 13-4.  When the storm began interfering with NEM's deliveries to HFS on February 16–17, 2021, NEM worked to resolve the issue through steps such as confirming the reliability of its supply and purchasing additional supplies.  *Id*.  The Base Contract furthermore did not require NEM to purchase replacement gas when deliveries were impaired on February 16–17, 2021.  *Supra* 6-7; *see also Ergon-W. Virginia, Inc.*, 706 F.3d at 425 ("The district court did not clearly err in finding that 'reasonable dispatch' does not include a duty to try to secure replacement gas.").

### B.    NEM's Allocation of Gas Was Fair and Reasonable.

"[T]he seller's obligation during a valid force majeure event is to provide a 'fair and reasonable' allocation of the available gas."  *LNG Americas, Inc.,*, 2023 WL 2920940, at *10 (quoting *Tejas Power Corp.*, 1999 WL 605550, at *2); *see* TEX. BUS. & COM. CODE ANN. § 2.615(2) (The seller "may so allocate [deliveries] in any manner which is fair and reasonable.").

---

[82]  App'x at 0001-0021, Ex. 1 (Base Contract), §§ 11.2, 11.3.

[83]  *LNG Americas, Inc. v. Chevron Nat. Gas*, 2023 WL 2920940, at *8 (S.D. Tex. Apr. 12, 2023) (holding that a force majeure event is one that renders a party's performance impossible would make the requirements of 'reasonable efforts' and 'reasonable dispatch' superfluous").

There can be no genuine dispute that NEM's allocation of gas was fair and reasonable. *See LNG Americas*, 2023 WL 2920940, at *10 ("Even if it was an element, the court concludes that there is no genuine dispute of material fact as to allocation fairness."). NEM's allocation was indisputably fair to HFS, as NEM ranked deliveries to HFS ahead of all its other customers, save for the ONG Utility that was directly serving critical human needs. *Supra* 14-5; *see also Tejas Power Corp.*, 1999 WL 605550 at *2–4 (upholding trial court finding that defendant's allocation was fair and reasonable where defendant ranked local distribution companies at a higher priority than plaintiff).

Under the circumstances, it would be quite extraordinary for HFS to advance the position that it was not "fair and reasonable" for NEM to prioritize deliveries to the ONG Utility given the state of emergency caused by Uri, together with OCC Order No. 716952 and all the other decrees and pipeline orders in neighboring regions, which compelled NEM to prioritize deliveries of gas to customers directly providing services necessary for sustaining human life. *Supra* 14; *see also* TEX. BUS. & COM. CODE ANN. § 2.615(1) ("Delay in delivery or non-delivery in whole or in part by a seller who complies with Subdivisions (2) and (3) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by … compliance in good faith with any applicable foreign or domestic governmental regulation or order….").

## IV.    HFS HAS NO CLAIM FOR NON-DELIVERY ON FEBRUARY 18, 2021.

To the extent HFS's claim relates to deliveries on February 18, 2021, it fails for an additional reason separate from the force majeure:  HFS wrongfully rejected a portion of the gas and interfered with its delivery.[84]

---

[84]    *See Atlas Air, Inc. v. Biskay Holdings LLC*, 2018 WL 3155828, at *6 (N.D. Tex. June 28, 2018) ("Under section 2.703 of the Texas Business and Commerce Code, … when a 'buyer wrongfully rejects or revokes acceptance of goods ... the aggrieved seller may ... withhold delivery of such goods.'") (citing *Serna, Inc. v. Harman*, 742 F.2d 186,

There is no dispute that NEM nominated the full Contract Quantity for delivery to HFS. *Supra 13*, 16. However, HFS rejected all but 7,500 MMBtu and received "less than half that amount." *Supra* 15-6. The record establishes conclusively that HFS received less than 7,500 MMBtu of gas because it improperly reduced its nomination intraday so it would not  match NEM's agreed on nomination of the Contract Quantity. *See supra* at 15-7.

Nor do HFS's shifting excuses for its conduct on February 18, 2021 raise a genuine issue of fact as to its claim for breach of contract. HFS initially asserted that it sold back 7,500 MMBtu to NEM pursuant to the Sellback provisions of the Transaction Confirmation, and thus was only obligated to submit a nomination for the remaining 7,500 MMBtu. *See supra* at 15-7. However, this argument fails as a matter of black letter contract application, because HFS failed to comply with the Sellback Deadline, which expired at 9:00 AM EST on February 17. *Supra* 15.

To the extent HFS manufactures a new argument at summary judgement—*i.e.* that it "was under no obligation to accept any additional gas" because NEM had allegedly "repudiated its obligations to deliver any gas on February 18"[85]—this argument also fails. NEM's declaration of force majeure was not a repudiation. *See Water Dynamics, Ltd. v. HSBC Bank USA, Nat. Ass'n*, 509 F. App'x 367, 369 (5th Cir. 2013) (anticipatory breach requires a showing that the breaching party "absolutely repudiated the contract" and "lacked just excuse for the repudiation"). NEM's communications to HFS on February 18 are also incompatible with HFS's post-hoc argument that NEM repudiated the contract. On the afternoon of February 18, NEM notified HFS that HFS's

---

191 (5th Cir. 1984)); *see also Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 896 F. Supp. 2d 582, 616, n. 124 (S.D. Tex. 2012) ("when a plaintiff . . . cause[d] [] its own injury, the plaintiff cannot recover . . . [from] its contract partners whose blameworthy acts or breaches were cases in fact of the plaintiff's injury") (internal quotations omitted) (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996)); *David Lewis Builders, Inc. v. Mid-Continent Cas. Co.*, 720 F. Supp. 2d 781, 790 (N.D. Tex. 2010), *aff'd*, 410 F. App'x 787 (5th Cir. 2011) (plaintiff "cannot recover [for] . . . his own failure to perform his contract") (internal quotations and citations omitted).

[85]   Pet. ¶ 18; *See also supra* at 16.

7,500 MMBtu nomination was causing supply cuts and requested that she restore her nomination to 15,000 MMBtu. *Supra* 16. Moreover, if HFS contends that it had no obligation to receive gas on February 18, it follows that NEM had no obligation to deliver and HFS has no claim for breach of contract.

<u>**CONCLUSION**</u>

For the foregoing reasons, NEM respectfully requests that the Court grant summary judgment in NEM's favor and that the Court should award NEM costs and any other relief the Court deems proper.

Dated:  October 25, 2024

Respectfully submitted,

By: /s/ Christopher D. Porter
Christopher D. Porter (SBN 24070437)
Melanie A. Guzman (SBN 24117175)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100
chrisporter@quinnemanuel.com
melanieguzman@quinnemanuel.com

Sascha N. Rand (*pro hac vice*)
Nathan Goralnik (*pro hac vice*)
Luke H. Phillips (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
sascharand@quinnemanuel.com
nathangoralnik@quinnemanuel.com
lukephillips@quinnemanuel.com

David M. Graham (SBN 24116450)
3100 McKinnon Street, Suite 1125
Dallas, Texas 75201
Telephone: (469) 902-3600
Facsimile: (469) 902-3610
davidgraham@quinnemanuel.com

*Counsel for Defendant NextEra
Energy Marketing, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 25th day of October, 2024, electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

/s/ Luke H. Phillips
Luke H. Phillips

*Counsel for Defendant NextEra Energy Marketing, LLC*