**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| HF Sinclair Refining & Marketing LLC | § | |
| (f/k/a/ HollyFrontier Refining & Marketing | § | |
| LLC), | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 3:23-cv-1798 |
| | § | |
| v. | § | Hon. Judge Brantley Starr |
| | § | |
| NextEra Energy Marketing, LLC, | § | |
| | § | |
| Defendant. | § | |

---

## PLAINTIFF'S SUPPLEMENTAL BRIEF ON DAMAGES

---

## I.    INTRODUCTION[1]

NEM once again distorts straightforward facts in a last-ditch effort to minimize the amount of its already established liability.  After NEM breached its gas delivery obligations on GD 16, 17, and 18, HFS acquired replacement gas from Cimarex.  It spent millions more than it would have had NEM delivered the contracted gas.  HFS's gas transporter, ONG, then transported this cover gas from OGT Pool to the Tulsa Plant through ONG's pipeline (the "ONG Pipeline").  This is the only "cover" gas that HFS was able to obtain on GD 16–18.  Despite HFS's efforts to ramp down the Tulsa Plant, however, it could not overcome the shortfall created by NEM's non-performance.  Accordingly, the Tulsa Plant ended up using additional gas from the ONG Pipeline that was beyond the gas that HFS purchased from Cimarex at OGT Pool.  This did not happen as a result of HFS engaging in a cover transaction, but rather because ONG did not stop gas flow to the plant.

Because of the way this additional gas is accounted for by the parties, it is ultimately attributed to HFS's *preexisting* surplus of gas, called a "long imbalance."  A long imbalance forms when HFS purchases gas and provides it to ONG for transport but the Tulsa Plant does not use it all on the scheduled day.  ONG holds this excess on its records for potential delivery to, and use by, HFS on a later day, depending on ONG operations and discretion.  Thus, when the Tulsa Plant received additional gas on GD 16, 17, and 18, both ONG Pipeline and HFS accounted for that gas as a draw on HFS's existing long imbalance, thereby treating HFS as receiving gas that HFS had *previously purchased under separate transactions prior to GD 16-18*.  It was not new gas, cover gas, or replacement gas under the NAESB, and it is irrelevant for the calculation of HFS's damages.

---

[1] HFS incorporates its facts, defined terms, and legal standard from its Brief in Support of its Motion for Summary Judgment ("HFS MSJ Brief"), Dkt. No. 93, and Appendix in Support ("HFS App."), Dkt. No. 95.

Despite having the benefit of additional discovery and a deposition on this specific topic,[2] NEM still cannot justify treating this long imbalance as a cover transaction. Accordingly, HFS is entitled to its full requested damages of $14,968,783—broken down as $2,743,688 for GD 16, $7,061,249 for GD 17, and $5,163,846 for GD 18.[3] *See* HFS MSJ Brief at 12–14.

## II.    ADDITIONAL FACTUAL BACKGROUND ON LONG IMBALANCE

HFS purchases gas at OGT Pool and then delivers it into the separate ONG Pipeline.[4] Pursuant to a Transportation Agreement, ONG transports that gas to the Tulsa Plant, which then burns the gas.[5] Because gas is fungible, ONG is not transporting a uniquely identifiable set of gas molecules to the Tulsa Plant. Instead, HFS is simultaneously purchasing and having gas delivered into the ONG Pipeline, while the Tulsa Plant is also burning and, by its mere operation, "pulling" gas out of the Pipeline (not unlike a house "pulls" natural gas when turning on a gas grill).[6]

HFS attempts to balance these purchases and usages, but it is not an exact science. Gas purchases at OGT Pool start the day before the gas is delivered.[7] HFS must anticipate the Tulsa Plant's needs for the following day. Moreover, HFS does not tell ONG a specific volume to deliver. The plant will simply burn the gas it needs off of the flow of gas in the ONG Pipeline (the pipeline

---

[2] NEM insinuates that there were issues regarding the sufficiency of HFS's supplemental production. NEM's Brief Regarding HFS's Damages ("NEM Damages Br."), Dkt. No. 163, at 3. In reality, HFS produced documents on an expedited basis at NEM's request. [HFS App. in Support of its Supp. Br. ("HFS Damages App.") Ex. A-1 at App. p. 5]. When questioned about the production, HFS provided a detailed explanation with citations to specific documents. [*Id.*] HFS explained, however, that it has no documents regarding the internal valuation or pricing of a long imbalance. [*Id.*]; *see also* Blankenship Depo. Tr. at 42:22–43:11; 50:6–15 [HFS Damages App. Ex. A-2 at App. p. 28–30]. NEM, nevertheless, seized on this opportunity to repeatedly seek *additional documents* outside the scope of the Court's Order. [HFS Damages App. Ex. A-1 at App. p. 7–10]. Given that HFS is confident in the merits of its position, HFS searched through archived documents going years prior to the events at issue and produced what it could locate in response to NEM's additional requests. [*Id.* at App. p. 5–9]. HFS not only complied with the Court's Order but also voluntarily participated in NEM's fishing expedition to resolve this dispute expeditiously and absent any further imposition on Court resources.

[3] For the reasons already addressed in HFS's Response in Opposition to NEM's Motion for Summary Judgment, Dkt. No. 103, HFS continues to disagree with NEM's faulty argument that HFS is not entitled to damages on GD 18. *See* NEM Damages Br. at 2 n. 2.

[4] Blankenship Depo. Tr. at 63:18–22 [HFS Damages App. Ex. A-2 at App. p. 31]

[5] Blankenship Depo. Tr. at 63:1–22 [HFS Damages App. Ex. A-2 at App. p. 31]; [App. in Support of Def.'s Br. Regarding HFS's Damages ("NEM Damages App."), Dkt. No. 165, Exs. 8–9].

[6] Lokay Depo. Tr. Vol. 1 at 61:8–15. [NEM MSJ App. Ex. 4]; Blankenship Depo. Tr. at 87:21–88:5 [HFS Damages App. Ex. A-2 at App. p. 42–43].

[7] Brown Depo. Tr. at 24:24–26:1 [NEM MSJ App. Ex. 7].

always has some "line pack" gas, which is a baseline level of preexisting gas in the pipeline needed to maintain safe operating pressure).[8]  As operations change over the day, the Tulsa Plant may burn more or less gas.[9]  This, in turn, requires HFS to engage in additional same-day transactions to buy or sell gas at OGT Pool to match refinery operations as well as manage any gas supply issues.[10]

Given these variables, the amount of gas that is ultimately purchased and delivered into the ONG Pipeline at OGT Pool will not always equal the amount of gas that is used and pulled from the ONG Pipeline by the Tulsa Plant.[11]  If more gas is purchased and then delivered into the ONG Pipeline than the Tulsa Plant pulls out on a given day, this is recorded as a long imbalance.[12]  If this continues on subsequent days, this long imbalance will accumulate.[13]  Conversely, the mismatch between the gas purchased versus the gas burned may result in HFS using more gas than it purchased, in which case ONG and HFS account for it as HFS "drawing" upon this long imbalance.[14]  Thus, the additional gas the Tulsa Plant burns beyond HFS's purchases for that day comes from the long imbalance, which in turn comes HFS's purchases at OGT Pool on prior days.

Accordingly, a long imbalance is essentially a receivable or credit on HFS's account with ONG. It represents gas that HFS has previously purchased and accumulated but not yet used.  In other words, ONG is providing a form of delayed transportation from OGT Pool to the Tulsa Plant—*i.e.* gas was purchased and provided to the ONG Pipeline on one day (when the long imbalance was accumulated) but not delivered to and burned by the Tulsa Plant until a later day (when the long imbalance is drawn down).  When HFS decreases or draws on the long imbalance, HFS is merely using its previously purchased gas.  Indeed, NEM even agrees that the long imbalance represents gas

---

[8] Blankenship Depo. Tr. at 87:21–88:5 [HFS Damages App. Ex. A-2 at App. p. 42–43].
[9] Lokay Depo. Tr. Vol. 2 at 250:6–15 [NEM MSJ App. Ex. 4].
[10] Lokay Depo. Tr. Vol. 2 at 250:6–15, 259:15–25. [NEM MSJ App. Ex. 4].
[11] Blankenship Depo. Tr. at 69:8–21 [HFS Damages App. Ex. A-2 at App. p. 35].
[12] Blankenship Depo. Tr. at 69:8–21 [HFS Damages App. Ex. A-2 at App. p. 35].  If HFS puts less gas into the ONG Pipeline than the Tulsa Plant pulls out on a given day, this is referred to as a short imbalance for the day.
[13] Blankenship Depo. Tr. at 69:8–21 [HFS Damages App. Ex. A-2 at App. p. 35].
[14] Blankenship Depo. Tr. at 30:3–31:2 [HFS Damages App. Ex. A-2 at App. p. 26–27].

purchased in the past. NEM Damages Br. at 2. This does not, however, mean that the long imbalance is an ever-present potential source of gas for HFS or other refineries. ONG, in its discretion, can restrict customers' ability to create or use imbalances, such as by issuing a curtailment notice.[15]

Leading up to GD 16, 17, and 18, HFS had a long imbalance on the ONG Pipeline.[16] ONG, however, had issued a curtailment notice.[17] HFS was not allowed to draw on the long imbalance. This is undisputed; HFS actually asked to begin using its long imbalance after GD 18, which ONG denied because of the ongoing curtailment notice.[18] HFS's only option to cover NEM's shortfalls was to try to purchase sufficient gas to match the Tulsa Plant's anticipated usage.[19] To the extent that HFS was ultimately short on those days—principally due to NEM's non-delivery—ONG accounted for this additional gas by drawing down HFS's long imbalance.[20] For reasons unknown to HFS, ONG chose not to entirely shut off the Tulsa Plant's supply when it pulled more gas than HFS had purchased at OGT Pool.[21] There was still, however, an active curtailment notice requiring HFS's purchases to equal the Tulsa Plant's usage, and HFS continued to attempt to do so on GD 16, 17, and 18.[22]

## III.    ARGUMENT

### a)    Use of Long Imbalance Is Not a Cover Transaction Obtaining Replacement Gas.

Under Section 2.12 of the NAESB, the "Cover Standard" specifies that "if there is an unexcused failure to . . . deliver any quantity of Gas . . . then the [buyer] shall use commercially

---

[15] For example, if there are supply issues, ONG can restrict customers from creating imbalances that will cause safety issues with these pressures.
[16] Blankenship Depo. Tr. at 77:24-78:16, 81:15–82:12 [HFS Damages App. Ex. A-2 at App. p. 36–39].
[17] Blankenship Depo. Tr. at 81:15–82:12 [HFS Damages App. Ex. A-2 at App. p. 38–39]; [NEM Damages App. Ex. 11].
[18] [NEM Damages App. Ex. 7 at HFS_0000505]
[19] Blankenship Depo. Tr. at 77:24–78:16; 81:15–82:12 [HFS Damages App. Ex. A-2 at App. p. 36–39].
[20] Blankenship Depo. Tr. at 66:10–13, 87:13–20 [HFS Damages App. Ex. A-2 at App. p. 33, 42].
[21] Blankenship Depo. Tr. at 67:1–14, 83:13–84:2  [HFS Damages App. Ex. A-2 at App. p. 34, 41–41]. Accordingly, it is not that the Tulsa Plant "chose" to pull gas from the ONG pipeline. *See* NEM Damages Br. at 3. It was simply a byproduct of the state of operations during Winter Storm Uri, and ONG's decision to continue service.
[22] Blankenship Depo. Tr. at 29:1–17, 63:18–64:3; 81:15-82:12 [HFS Damages App. Ex. A-2 at App. p. 25, 31–32, 38–39]; [NEM Damages App. Ex. 7 at HFS_0000505].

reasonable efforts to . . . obtain Gas."[23]  It is undisputed that HFS's long imbalance entering GD 16 represented gas that HFS previously purchased *before* NEM's breach.  When HFS, not via any transaction (let alone, any commercial transaction) but by virtue of the refinery's continued operations, drew down on the long imbalance on GD 16, 17, and 18, the Tulsa Plant was essentially receiving and using gas HFS had already purchased.  This, thus, does not fall within the Cover Standard, which addresses gas that HFS obtained *after* NEM breached the contract.  *See* NAESB § 2.12 ("[] *if* there is an unexcused failure to . . . deliver any quantity of Gas . . . *then* the [buyer] shall use commercially reasonable efforts to . . . *obtain Gas*") (emphasis added).[24]

Moreover, the calculation of damages using a cover price under the Cover Standard "exclud[es] any quantity for which no *replacement* is available."[25]  With "respect to the *gas not replaced*" damages are calculated using the Spot Price.[26]  Again, the gas HFS used from the long imbalance cannot be "replacement" gas because HFS already purchased that gas prior to GD 16, 17, and 18.[27]  *See ATD Combusters, LLC v. Ameritube, LLC*, No. 618CV00077ADAJCM, 2019 WL 7759503, at *2 (W.D. Tex. Oct. 10, 2019) ("A buyer cannot draw from its own inventory in substitution for the goods due from the seller."); *TXU Portfolio Mgmt. Co., L.P. v. FPL Energy, LLC*, 529 S.W.3d 472, 485 (Tex. App.—Dallas 2016, no pet.) ("[P]re-breach purchases . . were no evidence of post-breach replacement purchases for the purpose of remedying the seller's actual breach.").

---

[23] NAESB § 2.12 [HFS MSJ App. Ex. A-3 at App. 056].
[24] [HFS MSJ App. Ex. A-3 at App. 056].
[25] NAESB § 3.2 (emphasis added) [HFS MSJ App. Ex. A-3 at App. 057].
[26] NAESB § 3.2 (emphasis added) [HFS MSJ App. Ex. A-3 at App. 057].
[27] To that end, NEM grossly mischaracterizes the testimony of NEM's corporate representative.  Mr. Blankenship never testified that HFS "agree[s] that the actual purchase prices for the gas that HFS used to build up its long imbalance prior to February 16, 17 and 18 were the prices relevant to determining HFS's proper cover damages."  NEM Damages Br. at 6.  Mr. Blankenship simply testified about internal valuations of imbalances. Blankenship Depo. Tr. at 42:22–43:11 [HFS Damages App. Ex. A-2 at App. p. 28–29].  He did not testify about whether the use of a long imbalance constituted obtaining replacement gas or what price to calculate cover damages.  Moreover, to draw on an existing long imbalance, HFS must create a short imbalance for the given day by using more gas than it purchases.  When Mr. Blankenship testified that "we valued it on the day that the imbalance was created," he was referring to the day the *short* imbalance is created, *i.e.* the day the long imbalance is drawn down.  Thus, his and Ms. Lokay's opinion is that use of gas from a long imbalance is valued based on the day it is drawn down not when it was created.

This interpretation is also consistent with the purpose of contractual damages. Damages are intended to provide the benefit of the bargain. *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001). Had NEM fully performed, then, at the conclusion of GD 16, 17, and 18, HFS would have both received the physical volumes NEM was required to deliver on those days **and** had its ONG long imbalance. NEM's theory that HFS's use of the long imbalance replaced NEM's undelivered volumes that were not covered by Cimarex deprives HFS of the full benefit of its bargain.

NEM's theory also creates the impossible task of determining which historic transaction is the replacement for which volume of later undelivered gas. As NEM agrees, there is no transaction with ONG, as ONG is merely delivering rather than selling the long imbalance gas.[28] The long imbalance accrued from historic purchases.[29] However, because gas is fungible, it is impossible to allocate the gas from a given past transaction as the gas that contributed to the long imbalance on that day. When drawing on a long imbalance, it is further impossible to determine what prior day's imbalance (and in turn which transaction from that day) is providing the gas being used. This "is significant because the cover damages measure requires the buyer ***to match*** the replacement goods' cost with the undelivered goods' contract price." *TXU Portfolio Mgmt. Co., L.P.*, 529 S.W.3d at 485 (emphasis added).[30]

Rather than facing this impossible matching problem, the simpler answer is that the historic transactions preceding GD 16, 17, and 18 and that form the long imbalance are not and cannot be cover for transactions made on GD 16, 17, and 18. Accordingly, HFS properly calculated its damages for the unreplaced gas using the spot price. *See* HFS MSJ Brief at 12–14.

---

[28] NEM relies on the historic transactions with counterparties at OGT Pool that built up the long imbalance rather than any purported transaction with ONG. *See* NEM Damages Br. at 6. NEM even agrees that the ONG Transportation Agreement only includes a transportation cost charged to HFS for delivery of the long imbalance and not some other type of cost that would suggest that there was a purchase of gas from ONG. NEM Damages Br. at 4. And the ONG invoice for February 2021 did, in fact, only have a transportation cost. [HFS Damages App. Ex. A-3 at App. p. 47, 50].

[29] Blankenship Depo. Tr. at 69:8–21. [HFS Damages App. Ex. A-3 at App. p. 35].

[30] Rather than address this logical impossibility, NEM ignores it all together by using a weighted average of past purchases. NEM Damages Br. at 6. NEM provides no explanation or legal support for this methodology.

**b)    If It Is a Cover Transaction, Use of Long Imbalance Gas Is Priced at the Market Price.**

As explained above, HFS's use of the long imbalance is not a gas transaction for replacement gas. Instead, ONG is acting as a transporter that is delivering gas that HFS already purchased days or weeks prior. Even assuming, however, that NEM was right that the use of the long imbalance is a cover transaction—which it is not—then the calculation of damages requires identification of a "purchase price paid by [HFS]."[31]

When the Tulsa Plant used more gas on GD 16, 17, and 18 than HFS purchased, HFS was short on the ONG Pipeline. ONG deducted that short position from HFS's preexisting long imbalance. The closest thing to a contemporaneous transaction for replacement gas is that HFS received gas from the long imbalance from ONG, and ONG received a credit for this short position. That credit is the nearest to a "price paid" from HFS to ONG.

The Transportation Agreement and incorporated Tariff do not include any provisions on how to value that short position credit on any day. However, there is a separate provision for "cash outs."[32] At the end of the month, if there is a short imbalance outside of a certain range, ONG can close out HFS's short imbalance position by requiring HFS to pay ONG—*i.e.*, essentially requiring HFS to pay to fill the shortfall.[33] That price is based on the Highest Common Price—*i.e.*, the highest Platt's Gas Daily Price for the month.[34] While this does not govern the purchase or sale of gas on any given day, it is the closest provision governing the price for being short. Accordingly, if a "payment price" needs to be assigned to HFS being short on GD 16-18, it would be the Highest Common Price for February 2021, which was the gas daily price for GD 18.[35]

---

[31] NAESB § 3.2 [HFS MSJ Ex. A-3 at App. 057].
[32] [NEM Damages App. Ex. 3 § 3.12].
[33] There is also a corresponding option to close out a long imbalance, which requires HFS to accept payment from ONG for ONG to take over and eliminate the long imbalance. [NEM Damages App. Ex. 3 § 3.12]. There was ultimately no cash out of any kind for February 2021. [HFS Damages App. Ex. A-3 at App. p. 47, 50].
[34] [NEM Damages App., Ex. 3 §§ 3.12(3), 3.12(5)].
[35] [NEM Damages App. Ex. 13 at App. 127].

Notably, this cover price is higher than the spot price for GD 16 and 17. Thus, valuing the use of the long imbalance as cover at this price results in even higher damages for HFS for GD 16 and 17 than HFS previously requested.[36] Despite this potential for an even greater recovery, HFS continues to believe that use of the long imbalance should not be treated as a cover transaction.

### c)    HFS Is Undisputably Owed Cover Damages from Cimarex Purchases.

Regardless of NEM's (incorrect) characterization of HFS's use of long imbalance, it is undisputed that HFS acquired replacement gas from Cimarex. *See* HFS MSJ Brief at 7–8. Based on the difference between the cover price and the contract price, the corresponding damages are $1,383,203 for GD 16, $6,968,042 for GD 17, and $4,762,600 for GD 18.[37] NEM, however, claims that HFS is only entitled to $1,150,827 for GD 16, $4,162,168 for GD 17, and $3,294,741 for GD 18. NEM Damages Br. at 2. As NEM did not provide any supporting calculations, it is unclear how NEM arrived at these amounts.[38] NEM also does not justify why these new damages are lower than even just the damages for the undisputed Cimarex transactions.[39]

For the reasons explained earlier in this Motion, HFS is entitled to its full $14,968,783 in damages. However, even if the use of the long imbalance was a cover transaction—which it was not—HFS is still entitled to its Cimarex damages of $13,113,845 ($1,383,203.23 for GD 16, $6,968,042 for GD 17, and $4,762,600.00 for GD 18).

## IV.    CONCLUSION

For the foregoing reasons, HFS requests that the Court deny NEM's Motion for Summary Judgment, grant HFS's Motion for Summary Judgment, and issue judgment in HFS's favor for

---

[36] HFS is prepared to provide a complete calculation at the Court's request.

[37] *See* Lerman Expert Rep. Table 5 [HFS MSJ App. Ex. A-11 at App. 184] (calculating Cimarex Damages in columns E, H, J, and L).

[38] NEM refers to a calculation of damages in Exhibit 1, but no unredacted Exhibit 1 has been filed. NEM Damages Br. at 7.

[39] This is especially confusing because Section 3.2 of the NAESB only allows the inclusion of the "positive" or "unfavorable" difference between the Contract Price and the replacement or spot price. NAESB § 3.2 [HFS MSJ App. Ex. A-3 at App. 057]. Thus, no negative damages are possible to lower the Cimarex damages.

$14,9668,783 (broken down as $2,743,688 for GD 16, $7,061,249 for GD 17, and $5,163,846 for GD 18), along with pre- and post-judgment interest, and any other relief to which HFS is entitled.[40]

Dated: May 30, 2025                     Respectfully submitted,

                                        */s/* Andrés Correa
                                        Andrés Correa
                                        acorrea@lynnllp.com
                                        Texas Bar No. 24076330
                                        Jared D. Eisenberg
                                        jeisenberg@lynnllp.com
                                        Texas Bar No. 24092382
                                        Leo Park
                                        lpark@lynnllp.com
                                        Texas Bar No. 24122983
                                        **Lynn Pinker Hurst & Schwegmann, LLP**
                                        2100 Ross Avenue, Suite 2700
                                        Dallas, Texas 75201
                                        Tel: (214) 981-3800
                                        Fax: (214) 981-3839

                                        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record via electronic filing on May 30, 2025.

                                        */s/* Andrés Correa
                                        Andrés Correa

---

[40] HFS will separately address its entitlement to costs and attorney's fees under Fed. R. Civ. P. 54(d) after the entry of any judgment.